1   MARY KATE SULLIVAN (State Bar No. 180203)
    mks@severson.com
2   HAROLD R. JONES (State Bar No. 209266)
    hrj@severson.com
3   SEVERSON & WERSON
    A Professional Corporation
4   One Embarcadero Center, Suite 2600
    San Francisco, California 94111
5   Telephone: (415) 398-3344
    Facsimile: (415) 956-0439
6
    Attorneys for Defendants
7   Wells Fargo Bank, N.A., U.S. Bank, N.A., as
    Trustee for Adjustable Rate Mortgage Trust
8   2006-3, Adjustable Rate Mortgage-Backed Pass-
    Through Certificates, Series 2006-3, incorrectly
9   sued herein as US Bank, N.A. as Trustee for the
    CSMC ARMT 2006-3 Trust, and Mortgage
10  Electronic Registration Systems, Inc.

11

12                   UNITED STATES DISTRICT COURT

13        NORTHERN DISTRICT OF CALIFORNIA–SAN FRANCISCO DIVISION

14

15  CHRISTOPHER P. ZAPATA and ELAINE A.          Case No.
    ZAPATA,
16                                                **NOTICE OF REMOVAL**
                   Plaintiff,                     **(Federal Question Jurisdiction)**
17
           vs.
18
    U.S. BANK, N.A., AS TRUSTEE FOR THE
19  CSMC ARMT 2006-3 TRUST; WELLS
    FARGO BANK, N.A.; FIRST AMERICAN
20  TRUST SERVICING SOLUTIONS, LLC
    F/K/A/ FIRST AMERICAN LOANSTAR
21  TRUSTEE SERVICES, LLC; MORTGAGE
    ELECTRONIC REGISTRATION SYSTEMS,
22  INC.,

23                 Defendant.

24

25

26

27

28

55000.0876/2868179.1

                                                         NOTICE OF REMOVAL

TO:    **THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1441 and 1446, defendants Wells Fargo Bank, N.A. ("Wells Fargo"), U.S. Bank, N.A., as Trustee for Adjustable Rate Mortgage Trust 2006-3, Adjustable Rate Mortgage-Backed Pass-Through Certificates, Series 2006-3, incorrectly sued herein as US Bank, N.A. as Trustee for the CSMC ARMT 2006-3 Trust, and Mortgage Electronic Registration Systems, Inc., (collectively "Defendants") hereby remove the above-captioned action from the Superior Court of the State of California, County of Alameda, to the United States District Court for the Northern District of California. Defendants allege that that they are entitled to removal pursuant to 28 U.S.C. § 1331, based upon federal question jurisdiction, as follows:

1.    **Jurisdiction**. Based on the Complaint, this action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1331, and is one which may be removed to this Court by Defendants pursuant to the provisions of 28 U.S.C. § 1441(b) because it arises under the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. §§ 1962, *et seq.* (see Compl. ¶¶ 74-108). This Court has supplemental jurisdiction over all other claims asserted by Plaintiffs Christopher Zapata and Elaine Zapata (collectively "Plaintiffs") in accordance with 28 U.S.C. §§ 1367(a).

2.    Defendants are named defendants in the civil action filed on or about August 14, 2013 by Plaintiffs in the Superior Court of the State of California, in the County of Alameda, Case No.:RG13601709, entitled *Christopher P. Zapata and Elaine A. Zapata v. U.S Bank, N.A., as trustee for the CSMC ARMT 2006-3 Trust, Wells Fargo Bank, N.A., First American Trustee Servicing Solutions, LLC F/K/A First American Loanstar Trustee Services, LLC and Mortgage Electronic Registration Systems, Inc. and Does 1 through 100 inclusive, Defendants* (the "State Court Action").

3.    The Complaint asserts the following eight claims against Defendants: (1) Breach of Express Agreements; (2) Breach of Implied Agreements; (3) Slander of Title; (4) Wrongful

1   Foreclosure; (5) Violation of California Civil Code § 2923.5; (6) Violation of California Civil

2   Code § 2923.55; (7) Violation of 18 U.S.C. § 1962; (8) Unfair Business Practices.

3        4.     On August 15, 2013, Plaintiffs served Wells Fargo and U.S. Bank with copies of

4   the Summons, and Complaint.  On August 19, 2013, Plaintiffs served MERS with a Notice of

5   Pendency of Action.  True and correct copies of these documents are attached hereto as <u>Exhibit A</u>,

6   as required by 28 U.S.C. § 1446(a).

7        5.     Defendants have not yet filed an answer or otherwise responded to Plaintiffs'

8   Complaint in the State Court Action.  Accordingly, the documents listed in the preceding

9   paragraph and attached hereto as <u>Exhibit A</u> constitute all process, pleadings, and orders served in

10   the State Court Action.

11        6.     This Notice of Removal is being filed within thirty days after receipt of service of

12   Plaintiffs' Complaint on Wells Fargo, and is therefore timely pursuant to 28 U.S.C. § 1446(b).

13        7.     Removal to this Court is proper because this is the district that embraces the county

14   where Plaintiff filed the State Court Action.  28 U.S.C. § 1441(a).

15        8.     Pursuant to Civil Local Rule 3-2(e), assignment to the Oakland Division or the San

16   Francisco Division of the Northern District of California is proper because this is alleged to be a

17   civil action arising in the county of Alameda.

18        9.     As required by 28 U.S.C. § 1446(d), Wells Fargo will provide written notice of the

19   removal of this action to Plaintiffs, and to the Alameda County Superior Court.

20       10.    The other defendant in the State Court Action who has been served with the

21   Complaint, First American Trustee Servicing Solutions, LLC, consents to and joins in Defendants'

22   removal of this action.  See <u>Exhibit B</u>.

23       WHEREFORE, Defendants pray that the State Court Action be removed from state court

24   to this Court and that this Court assume jurisdiction over the action and determine it on the merits.

25

26

27

28

NOTICE OF REMOVAL

DATED:  September 16, 2013

SEVERSON & WERSON
A Professional Corporation

By: _____
        Harold R. Jones

Attorneys for Defendants Wells Fargo Bank, N.A., U.S.
Bank, N.A., as Trustee for Adjustable Rate Mortgage
Trust 2006-3, Adjustable Rate Mortgage-Backed Pass-
Through Certificates, Series 2006-3, incorrectly sued
herein as US Bank, N.A. as Trustee for the CSMC
ARMT 2006-3 Trust, and Mortgage Electronic
Registration Systems, Inc.

NOTICE OF REMOVAL

# Exhibit A

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

ENDORSED
FILED
ALAMEDA COUNTY

AUG 14 2013

CLERK OF THE SUPERIOR COURT
by Frances Wilson
Deputy

**NOTICE TO DEFENDANT:**
(AVISO AL DEMANDADO):

U.S. Bank, N.A., as Trustee for the CSMC ARMT 2006-3 Trust; Wells
Fargo Bank, N.A.; (See Attached for additional parties)

**YOU ARE BEING SUED BY PLAINTIFF:**
(LO ESTÁ DEMANDANDO EL DEMANDANTE):

Christopher P. Zapata and Elaine A. Zapata

Received

AUG 21 2013

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| | |
|---|---|
| The name and address of the court is: (El nombre y dirección de la corte es:) Alameda County Superior Court 1225 Fallon Street, Oakland, CA 94612 | CASE NUMBER: (Número del Caso): RG 13691709 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Michael Yesk, 70 Doray Drive, Suite 16, Pleasant Hill, CA 94523; (925) 849-5525

| | | | | |
|---|---|---|---|---|
| DATE: AUG 14 2013 (Fecha) | Leah T. Wilson Executive Officer/Clerk | Clerk, by (Secretario) | Frances Wilson | , Deputy (Adjunto) |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify):

under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)

☐ other (specify):
4. ☐ by personal delivery on (date):

| | | |
|---|---|---|
| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009] | **SUMMONS** Page 1 of 1 | Code of Civil Procedure §§ 412.20, 465 www.courtinfo.ca.gov |

AUG 22 2013

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Zapata v. U.S. Bank, N.A.; et al. | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.):*

[ ] Plaintiff     [✓] Defendant     [ ] Cross-Complainant     [ ] Cross-Defendant

First American Trust Servicing Solutions, LLC F/K/A First American LoanStar Trustee Services, LLC; Mortgage Electronic Registration Systems, Inc. and DOES 1-100, Inclusive,

Page ___2___ of ___2___

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**





ENDORSED
FILED
ALAMEDA COUNTY

AUG 1 4 2013

CLERK OF THE SUPERIOR COURT
By Frances Wilson
Deputy

1   Michael Yesk (SB#130056)
    Megan Dailey (SB#221574)
2   Yesk Law
    70 Doray Drive, Suite 16
3   Pleasant Hill, CA 94523
    925-849-5525
4   m.yesklaw@gmail.com
    Attorneys for Plaintiffs

5

6                       ALAMEDA COUNTY SUPERIOR COURT

7                       IN AND FOR THE STATE OF CALIFORNIA

8   CHRISTOPHER P. ZAPATA and ELAINE A. )   Case No.: RG 13 6 9 1 7 0 9
    ZAPATA,                             )
9                                       )
                                        )   COMPLAINT FOR BREACH OF EXPRESS
10          Plaintiffs,                 )   AGREEMENT; BREACH OF IMPLIED
                                        )   AGREEMENT; SLANDER OF TITLE;
11      vs.                             )   VIOLATION OF CALIFORNIA CIVIL
                                        )   CODE SECTION 2923.5 ; VIOLATION OF
12  U.S. BANK, N.A., AS TRUSTEE FOR THE )   CALIFORNIA CIVIL CODE SECTION
    CSMC ARMT 2006-3 TRUST; WELLS       )   2923.55; 18 U.S.C. § 1962 ; VIOLATIONS
13  FARGO BANK, N.A.; FIRST AMERICAN    )   OF CALIFORNIA BUSINESS AND
    TRUST SERVICING SOLUTIONS, LLC )       PROFESSION CODE SECTION 17200; AND
14  F/K/A FIRST AMERICAN LOANSTAR       )   INJUNCTIVE RELIEF
    TRUSTEE SERVICES, LLC; MORTGAGE )
15  ELECTRONIC REGISTRATION SYSTEMS, )      Unlimited Jurisdiction
    INC. AND DOES 1-100, INCLUSIVE,     )   Jury Trial Demanded
16                                      )
            Defendants.                 )
17  _____

18                              I. Introduction

19          1.      This action arises of out the current economic crisis that has hit the nation and

20  continues to destroy homeowners' ability to maintain their properties.   The failure and

21  unraveling of the real estate market has caused a rush of foreclosures on properties all over the

22  country by banks and mortgage servicing companies.   As the foreclosure crisis continues, it has

23  become clear that in their efforts to foreclose on as many properties as quickly as possible

24  lenders and servicers have been taking action outside the law.   The extent of the crisis and the

25  clear need for action has once more been highlighted by the recent national mortgage settlement.

26

 

2.  This case is yet another example of those in the mortgage and foreclosure industry engaging in wrongful, illegal, and permanently damaging activities against homeowners.

## II. Parties

3.  Plaintiffs CHRISTOPHER P. ZAPATA and ELAINE A. ZAPATA (collectively "Plaintiffs") are allegedly the Trustors/Borrowers on that certain Deed of Trust recorded on April 26, 2006 as Instrument No. 2006168031 in the Official Records of the Recorder of Alameda County, California, purportedly putting a lien on the real property located at 288 Isle Court, Hayward, California 94545 (the "Subject Property"). A true and correct copy of this Deed of Trust is attached hereto as Exhibit A.

4.  Plaintiffs are informed and believe and on that basis allege that Defendant U.S. Bank, N.A. ("U.S. Bank"), is a National Banking Association organized under the laws of the United States with its main office in Cincinnati, Ohio and is and at all times relevant hereto was doing business in Hayward, California.

5.  Plaintiffs are informed and believe and on that basis allege that Defendant Wells Fargo Bank, N.A., ("Wells Fargo"), is a National Banking Association organized under the laws of the United States with its main office in South Dakota, and is and at all times relevant hereto was doing business in Hayward, California.

6.  Plaintiffs are informed and believe and on that basis alleges that Defendant First American Trustee Servicing Solutions ("FATSS"), is a California Corporation registered as business entity number C0553525 with the California Secretary of State, and formerly known as First American Loanstar Trustee Services, LLC.

7.  Plaintiffs are informed and believe and on that basis allege that Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), is a Corporation which is not licensed to do business in California and is suspended from doing business in California since March 25, 2009, and at all times relevant hereto was illegally conducting business in Hayward, California.

 

8.      Plaintiffs are ignorant of the true names and capacities of defendants sued herein as DOES 1 through 100, inclusive, and therefore sues these defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.

### III. Venue and Jurisdiction

9.      All events referred to in this complaint and the Subject Property are located within the boundaries of Alameda County in the State of California.  Therefore, jurisdiction and venue is properly with this Court.

### IV. Facts

10.      On April 26, 2006, Plaintiffs recorded a Deed of Trust ("DOT") in the Alameda County Recorder's Office against the Subject Property to secure a Promissory Note in the amount of $836,000 in favor of Family Lending Services, Inc. ("FLS") as original "Lender." The DOT names S.P.S Affiliates, a California Corporation, ("SPS") as Trustee.  The DOT also names MERS as nominee for Lender and as beneficiary under the DOT.

11.      Subsequently, as was FLS's usual practice, it securitized and sold the beneficial interest in Plaintiffs' Deed of Trust to the Adjustable Rate Mortgage Trust 2006-3, Adjustable Rate Mortgage-Backed Pass-Through Certificates Series 2006-3 (the "ARM Trust 2006-3") according to Plaintiffs' audit, Mortgage Securitization Audit & Analysis Report ("Audit"), a true and correct copy of which is attached hereto as Exhibit B and incorporated herein by reference.

12.      On October 7, 2009, a Notice of Default and Election to Sell Under Deed of Trust ("First NOD") was recorded in the Alameda Recorder's Office by First American Title Insurance Co. as Attorney-in-Fact for First American Title Loanstar Trustee Services, LLC. [A Rescission of Notice of Default was subsequently recorded on September 21, 2012.]

13.      On November 12, 2009, a Substitution of Trustee ("SOT") was recorded in the Alameda County Recorder's Office.  Through this document, MERS purports to substitute FATSS's predecessor in interest as trustee under the DOT in place of SPS.



14.     On November 30, 2009, an Assignment of Deed of Trust was recorded in the Alameda County Recorder's office. Through this Assignment, MERS as beneficiary, purports to assign the beneficial interest in Plaintiffs' Deed of Trust to U.S. Bank, N.A. as Trustee for the CSMC ARMT 2006-3 Trust.

15.     On July 1, 2010, a Notice of Trustee's Sale ("NOTS") was recorded in the Alameda County Recorder's Office by FATSS, signaling the final stage in the foreclosure process.

16.     On August 21, 2012 a Loan Modification Deed of Trust ("Loan Modification DOT") was issued by Wells Fargo as Attorney-in-Fact for U.S. Bank, N.A. as Trustee for the CSMC ARMT 2006-3 Trust. The Loan Modification DOT provided for a fixed interest rate and amended and supplements the DOT, Timely Payment Rewards Rider, and Note dated April 7, 2006 secured by the DOT. A true and correct copy of the Loan Modification DOT is attached hereto as Exhibit C.

17.     On September 21, 2012 a Notice of Rescission of NOD was issued by FATSS as agent for the beneficiary and rescinded the NOD recorded on October 7, 2009.

18.     On April 4, 2013, a Second Notice of Default and Election to Sell Under Deed of Trust ("Second NOD") was recorded in the Alameda Recorder's Office by First American Title Insurance Co. Although this document indicates there is an Attached Declaration, Plaintiffs are not in possession of, and were not served with a declaration of compliance with California Civil Code § 2923.5.

19.     Thereafter, Defendants set a Trustee's Sale which is currently scheduled for August 19, 2013 as Trustee Sale No. CA1300252787, to be conducted by First American Title Insurance on behalf of purported Lender U.S. Bank.

A. First Cause of Action for Third Cause of Action for Breach of Express Agreements by Plaintiffs Against All Defendants

20.     Plaintiffs re-allege and incorporate by reference all prior paragraphs in this complaint, as though fully set forth hereafter.

 

21.     Plaintiffs were damaged as a direct and proximate result of Defendants' breach of the Deed of Trust herein described as they risk losing title and possession to their properties if Defendants are allowed to proceed with a foreclosure.

       **1) Breaches of Deed of Trust**

22.     Plaintiffs Deed of Trust includes provisions for acceleration remedies limiting the power of sale to the lender in case of default.

23.     The Deed of Trust for the Subject Property provides:  "If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold.  Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. [] Trustee shall give public notice of sale . . . ." See Ex. A, p. 12, ¶ 22.

24.     Defendants violated this clause by executing an invalid and false Notice of Default ("NOD") or causing the NOD to be recorded, when it was not in fact the true Lender or Trustee.  Because FLS sold the Deed of Trust on or before July 31, 2006 (see Ex. B, p. 36), U.S. Bank, as Trustee could have acceded to at the most, servicing rights to Plaintiffs' loan through the Assignment of Deed of Trust recorded on November 30, 2009.  U.S. Bank could not have acquired the beneficial interest in the Deed of Trust.  Defendant U.S. Bank, as Trustee is not the Lender under the Deed of trust and lacks the power of sale, as does Wells Fargo acting on behalf of U.S. Bank as Servicer because as an agent, Wells Fargo could not possess a greater interest than its principal.  Despite the fact that none of the Defendants were ever the Lender, FATSS or predecessor in interest recorded a Notice of Default and MERS, U.S. Bank and Wells Fargo either caused FATSS to record a NOD or recorded false documents purporting to create a chain of title to validate an otherwise unlawful foreclosure as will be set forth below and which facts are incorporated herein by reference including a false Assignment of Deed of Trust and thus breached the above clause of Plaintiffs' Deed of Trust.



**2) Breaches of PSA**

25.      Plaintiffs' Audit indicates that Defendants are in breach of the Pooling and Servicing Agreement for the ARM Trust 2006-3 and in violation of IRS Code Sec. 860G (2004, as amended).

26.      Plaintiffs are informed and believe the securitized trusts must have received the Assignment of the Beneficial Interest of the Deed of Trust within 90 days of the close of the Trust which was on July 31, 2006 (see Ex. B, p. 23), pursuant to the PSA for the Trust (see Ex. B, p. 32 "The Trustee . . . shall take any action or cause the Trust Fund <u>to take any action necessary to create or maintain the status of each REMIC created hereunder as a REMIC under the REMIC Provisions and shall assist each other as necessary to create or maintain such status</u>."). In this case there is no recorded assignment. Late recording was a business practice of JP Morgan that saved thousands of dollars of recording fees, preparation fees, etc. Although the PSA does not specify recording, they do specify transfer and in many cases, such as is the case here, there is no evidence of chain of title until the time of the initiation of foreclosure and recordation of an assignment, years after the securitization occurred. The consequence, however, is that all those loans are not assets of the Trust, including Plaintiffs' Deed of Trust. Therefore, Defendants would either need to disclaim the asset if the Trust wishes to remain a pass-through entity, or pay the 35% corporate/trust tax rate on all of its income. Plaintiffs' counsel on behalf of Plaintiffs, is a whistleblower to this scheme under the authority and at the request of the Internal Revenue Service, pursuant to 26 U.S.C. 7801(1982, as amended), for the purpose of reporting potential violations of internal Revenue laws. Defendants' PSA provides a duty to defend, distribution, reporting, and indemnification by and among the parties and their agents, including servicers, whose agents, the trustee, are contractually bound to the borrower/Plaintiffs under the PSA, the DOT, and Loan Modification DOT. and whether there was a breach needs to be determined at trial. Therefore, Plaintiffs are third-party beneficiaries to the PSA and have standing to sue for breach.

 

27.     The closing date for the ARM Trust 2006-3 was July 31, 206 and according to the Trust's own policies any assets must have been accepted by the Trust prior to the closing date. Therefore, U.S. Bank, as Trustee of the Trust and Wells Fargo as servicer for the Trust and MERS as nominee for U.S. Bank, as Trustee of the Trust violated the terms of the PSA by failing to record an Assignment of the Deed of Trust by the closing date and attempting foreclose on Plaintiffs' home without the power of sale due to the irreversibly broken chain of title.

### 3) Breaches to Loan Modification Agreement

28.     On June 8, 2012, Plaintiffs were offered, and accepted a Loan Modification Agreement of the terms their Note by and with Wells Fargo, but the agreement that was recorded was signed only by Plaintiffs and not by Wells Fargo.  This agreement provided for a fixed interest rate for Plaintiffs' Note.  Although Plaintiffs paid as agreed at least up until April 4, 2013, Wells Fargo was a stranger to Plaintiffs' DOT with no rights to receive or demand payments pertaining to Plaintiffs' Note or DOT, invalidating the Loan Modification Agreement.

29.     The above-mentioned recorded documents cause economic damages to Plaintiffs also because they disclose a claim of right, title or interest in the subject property which gives rise to a need for policy endorsements for title insurance, settlement of a claim shown on a title report, and/or a significant dissuasive factor for any prospective purchaser inspecting the property for sale, and/or its disclosures, any and all of which factors negatively affected and continue to affect the purchase price and vendibility of the Subject Property in an amount to be proven at trial.

30.     The aforementioned breaches of agreement made it necessary for Plaintiffs to retain attorneys and to bring this action to cancel the instruments casting doubt on Plaintiffs' title. Therefore, Plaintiffs are entitled to recover attorneys' fees and costs incurred in cancelling the instrument.  The exact amount of such damages is not known to Plaintiffs at this time, and Plaintiffs will move to amend this complaint to state such amount when the same becomes known, or on proof at the time of trial.

**B. Second Cause of Action for Breach of Implied Agreements by Plaintiffs Against All Defendants**

31.     Plaintiffs re-allege and incorporate by reference all prior paragraphs in this complaint, as though fully set forth hereafter.

32.     Plaintiffs are the borrower to that certain Deed of Trust referenced herein and subject to the PSA pursuant to the sale from FLS to the securitized the Trust, the ARM Trust 2006-3.

33.     U.S. Bank, as Trustee, is the Lender under the Plaintiffs' DOT or purported successor in interest and Plaintiffs are informed and believe and thereupon allege Wells Fargo is the Servicer to the securitized trust under the PSA. MERS and FATSS are agents for U.S. Bank, as Trustee, or Wells Fargo on behalf of U.S. Bank, as Trustee, as Servicer, under the DOT.

34.     The ARM Trust 2006-3 PSA provides a duty to defend, distribution, reporting, and indemnification by and among the parties and their agents, including servicers, whose agents, the trustee, are contractually bound to the borrower/Plaintiff under the PSA and the DOT.

35.     The Loan Modification Agreement was purportedly executed among Plaintiffs and Wells Fargo, but Plaintiffs were never issued an agreement that was signed by Wells Fargo and the Loan Modification Agreement recorded on August 21, 2012 was signed only by Plaintiffs.

36.     Defendants materially and willfully or deliberately breached their agreements with Plaintiffs, and with the securitized trusts including the ARM 2006-3 Trust, and committed the following acts:

a.     U.S. Bank, Wells Fargo, MERS, and FATSS invoked the power of sale without notice to Plaintiffs as required under when it lacked the power of sale as required under the terms of the Deed of Trust.

b.     U.S. Bank, Wells Fargo, MERS, and FATSS violated the PSA for the ARM 2006-3 Trust by failing to record the assignment of the DOT in violation of the PSA.

c.      U.S. Bank and Wells Fargo violated the Loan Modification Agreement because by failing to record the assignment of the DOT in violation of the PSA.

37.     By virtue of the contractual relationship between Plaintiffs and U.S. Bank, Wells Fargo, MERS, and FATSS, Plaintiffs are entitled to void the power of sale clause of the agreement, and/or indemnification for any problems, claims or losses caused to Plaintiffs by enforcement of this clause.

38.     Plaintiffs were damaged by these breaches in that Plaintiffs risk losing title to their Properties if the power of sale clause is enforceable.

39.     The aforementioned breach of agreement(s) made it necessary for Plaintiffs to retain attorneys and to bring this action to cancel the instruments casting doubt on Plaintiffs' title. Therefore, Plaintiffs are entitled to recover attorneys' fees and costs incurred in cancelling the instrument.  The exact amount of such damages is not known to Plaintiffs at this time, and Plaintiffs will move to amend this complaint to state such amount when the same becomes known, or on proof at the time of trial.

C.  Third Cause of Action for Slander of Title

40.     Plaintiffs re-allege and incorporate by reference all prior paragraphs in this complaint, as though fully set forth hereafter.

41.     The Substitution of Trustee recorded on November 12, 2009 is also invalid because it was issued by MERS on behalf of FLS or U.S. Bank in violation of the terms of Plaintiffs' Deed of Trust.  Plaintiffs' Deed of Trust limits appointment of successor trustees to the powers of the Lender and names the Lender in this case as FLS.  Because the sale and transfer to the securitized trust occurred on July 31, 2006, according to Plaintiffs' audit, no Defendant, including U.S. Bank or Wells Fargo or MERS, can step in the shoes of FLS to appoint a successor trustee in accordance with the terms of paragraph 24 of Plaintiffs' Deed of Trust.  See Ex. A, p. 12, ¶ 24.  By recording a Substitution of Trustee purportedly on behalf of U.S. Bank, when the evidence indicates that U.S. Bank failed to receive a legal assignment of

 

1   interest, Defendants acted with malice and reckless disregard for the truth. For the reason just

2   stated above, therefore, the November 12, 2009 Substitution of Trustee is false and invalid.

3       42.   The November 30, 2009 Assignment of Deed of Trust is false and invalid. As

4   discussed above, FLS was the original lender, however, FLS securitized and sold the beneficial

5   interest in Plaintiffs' Deed of Trust on or before July 31, 2006 shortly after it recorded the Deed

6   of Trust on April 26, 2006.  See Ex. B, p. 36. From that time on, FLS no longer held the

7   beneficial interest under the Deed of Trust. Thus, in November of 2009, MERS could not have

8   have transferred the beneficial interest in Plaintiffs' Deed of Trust to U.S. Bank, as Trustee. 27.

9       43.   The April 4, 2013 Notice of Default is false invalid and therefore constitutes an

10  improper cloud on Plaintiffs' title. The Notice of Default recorded on April 4, 2013 is invalid

11  because it was signed by Tammy Rossum, Supervisor, allegedly as an employee of FATSS or

12  predecessor interest. However, Ms. Rossum is not in fact an employee of FATSS, but instead

13  Ms. Rossum is an employee of U.S. Bank or Wells Fargo, acting as FATSS. Thus, it is unclear

14  whether Ms. Rossum had the authority to sign on behalf of FATSS or U.S. Bank as Trustee to

15  the DOT or Wells Fargo as Servicer and nevertheless was never authorized by the true

16  beneficiaries the certificate holders of the ARM Trust 2006-3. By recording a document signed

17  by Ms. Rossum, purportedly on behalf of FATSS, without legal authority and in violation of

18  contract and state and federal laws, Defendants acted with malice and reckless disregard for the

19  truth. For the reason just stated above, therefore, the April 4, 2013 Notice of Default is false and

20  invalid.

21      44.   Moreover, the April 4, 2013 Notice of Default is invalid because Defendant

22  FATSS executed the Notice of Default, purportedly as Trustee, but FATSS was not in fact the

23  Trustee under Plaintiffs' Deed of Trust on that date because MERS lacked the power to appoint

24  FATSS. The Substitution of Trustee was invalid. Thus, as of the date the NOD was recorded

25  FATSS was not the Trustee, rendering the Notice of Default false. And there is no legal

26  agreement between FATSS transferring valid agency with respect to Plaintiffs' DOT.

45.     The April 4, 2013 Notice of Default is also invalid because it failed to comply with California Civil Code § 2923.5 as is set forth below because there is no declaration of compliance with Section 2923.5 signed or attached to the NOD.

46.     The recording of the November 12, 2009 Substitution of Trustee, November 30, 2009 Assignment of Deed of Trust, and April 4, 2013 Notice of Default, and maintaining the unenforceable Deed of Trust in the public record falsely, knowingly wrongfully, without justification, in violation of statute, unprivileged, and with malice given the fact that both Defendants knew U.S. Bank or Wells Fargo could not have been assigned the power of sale to Plaintiffs' Deed of Trust through the November 30, 2009 Assignment of Deed of Trust and wrongfully recorded the false documents with such knowledge, and caused doubt to be placed on Plaintiffs' title to the property.  The false recordation of the foregoing document directly impairs the vendibility of Plaintiffs' property on the open market in the amount of a sum to be proved at trial.

47.     The false documents including the April 26, 2006 Deed of Trust and made it necessary for Plaintiffs to retain attorneys and to bring this action to cancel the instruments casting doubt on Plaintiffs' title. Therefore, Plaintiffs are entitled to recover attorneys' fees and costs incurred in cancelling the instrument.  The exact amount of such damages is not known to Plaintiffs at this time, and Plaintiffs will move to amend this complaint to state such amount when the same becomes known, or on proof at the time of trial.

**D. Fourth Cause of Action for Wrongful Foreclosure By Plaintiffs Against Defendants**

48.     Plaintiffs re-allege and incorporate by reference all prior paragraphs in this complaint, as though fully set forth hereafter.

49.     Plaintiffs are not and have not alleged that Plaintiffs' Deed of Trust or any contract, or legal authority prevents FLS and other original lenders from securitizing deeds of

1  trust by retaining or severing servicing rights from mortgage notes and deeds of trust and selling

2  the mortgage notes and deeds of trust to investors.

3      50.    Plaintiffs alleged that the securitization and foreclosure process, in this instance,

4  was mishandled as will be set forth below and therefore prevents Defendants from enforcing

5  Plaintiffs' Deed of Trust because it is too late to correct these defects including violations of the

6  California Civil Code, violations of the PSA for the securitized trust, use of robo-signers, and

7  violations of the terms of Plaintiffs' Deed of Trust.

8      51.    Defendants lack the power of sale and cannot complete a valid foreclosure. The

9  Substitution of Trustee recorded on November 12, 2009 is invalid and of no legal effect.

10  Therefore, Defendant FATSS is not the present Trustee under Plaintiffs' Deed of Trust.

11  Moreover, Defendant U.S. Bank and Wells Fargo are not the present beneficial interest holder as

12  FLS sold Plaintiffs' Deed of Trust to the Trust in 2006. From that point on, the Trust became the

13  only true owner of the beneficial interest under the Deed of Trust. Since neither Defendant U.S.

14  Bank nor Wells Fargo owns the beneficial interest, they lack the power of sale over the Subject

15  Property, creating a break in the chain of title of three years and four months, which exceeds

16  mere irregularities in the foreclosure documents. See Ex. B, p. 36. And Defendants concede the

17  November 30, 2009 Assignment is invalid because they issued a Corrective Assignment of DOT

18  by MERS as nominee for FLS correcting the assignee to read as: U.S. Bank, N.A., as Trustee for

19  the Adjustable Rate Mortgage Trust 2006-3, Adjustable Rate Mortgage Backed Pass-Through

20  Certificates. Series 2006-3 which was recorded on December 11, 2012. See Exhibit B, p. 53.

21      52.    The Substitution of Trustee was wrongful because the Securitized Trust of which

22  U.S. Bank is the Trustee had already closed and was unable to accept any new assets without

23  giving up its tax-free status as a REMIC under IRC 860G. Therefore, if U.S. Bank asserts that it

24  violated the Pooling and Servicing Agreement and the Prospectus and accepted the Plaintiffs'

25  loan after the closing date, then it must pay the 100% tax penalty that violation of these

26  documents causes to accrue.

 

53.     Both because the Substitution of Trustee failed and because neither U.S. Bank nor Wells Fargo is the present beneficiary, neither Defendant has the legal power to complete a valid foreclosure of Plaintiffs' property.

54.     Thus, allowing a Trustee's Sale of Plaintiffs' home to be completed would violate the statutory scheme governing non-judicial foreclosures and would cause Plaintiffs to wrongfully lose their home. See Cal. Civ. Code § 2924 et seq.

55.     A foreclosure sale of Plaintiffs' property on behalf of Defendant U.S. Bank and/or Wells Fargo would be invalid and wrongful and based on a false NOD executed by an entity without legal authority.

56.     FATSS cannot conduct a valid foreclosure sale on behalf of Defendant U.S. Bank or Wells Fargo because neither is the true present beneficiary under Plaintiffs' Deed of Trust. Although FLS was the original beneficial interest holder under Plaintiffs' Deed of Trust, neither U.S. Bank or Wells Fargo was the "present beneficiary" when MERS executed the Substitution of Trustee on November 12, 2009. Therefore MERS could not make a valid substitution of trustee in favor of FATSS. Thus, the attempted Substitution of Trustee failed and is void. As Defendant FATSS is not the true present Trustee under Plaintiffs' Deed of Trust, it lacked the power to record a valid NOD and cannot complete a valid foreclosure sale of Plaintiffs' home.

57.     Plaintiffs are not required to tender the amount due to challenge documents recorded and clouding Plaintiffs' title to the Property. *Tamburri v. Suntrust Mortgage, Inc.* (N.D. Cal. 2011) 2011 WL 6294472, *4 ("where a sale is void, rather than simply voidable, tender is not required"). As the Court found in *Dimock*, a Trustee's Deed issued by an entity who was not the correct Trustee is void. *Dimock v. Emerald Properties, Inc.* (2000) 81 Cal. App. 4th 868. 876; *see also Lona v. Citibank, N.A.* (2011) 202 Cal. App. 4th 89, 113.

58.     Plaintiffs need not establish inadequacy of the legal remedy in the particular case; historically, land is treated as unique. This is a presumption. The presumption is conclusive as to owner occupied properties, such as Plaintiffs. (See Civil Code § 3387; *see Remmers v.*

 

*Ciciliot* (1943) 59 C.A.2d 113, 119, 138 P.2d 306; *Fleishman v. Woods* (1901) 135 C. 256, 261, 67 P. 276; *Pike v. Hayden* (1950) 97 C.A.2d 606, 612, 218 P.2d 578 [agreement to lease service station and cafe]; *Ellison v. Ventura Port Dist.* (1978) 80 C.A.3d 574, 579, 145 C.R. 665, citing the text; *Abadjian v. Superior Court* (1985) 168 C.A.3d 363, 374, 214 C.R. 234. Therefore, the loss of Plaintiffs' residence is the necessary prejudice that would result from the foreclosure. Plaintiffs were never in default on their Note due to the break in the chain of title.

59.   For the reasons stated above, there is a likelihood that Plaintiffs will prevail on the merits of their wrongful foreclosure claim.  If Defendants are permitted to rely on the void and wrongful NOD to complete this foreclosure process by conducting a Trustee's sale and issuing a Trustee's Deed Upon Sale, Plaintiffs will wrongfully lose their home. Such injury is irreparable and cannot be adequately compensated by financial means.  Moreover, real property is considered unique in California, and monetary damages are deemed inadequate to compensate Plaintiffs for the loss thereof. *Stockton v. Newman*, 148 Cal. App. 2d 558, 564 (1957).

WHEREFORE, Plaintiffs pray for relief as set forth below:

**E.   Fifth Cause of Action for Violation of Cal. Civ. Code § 2923.5 By Plaintiffs Against Defendants**

60.   Plaintiffs re-allege and reincorporate by reference the allegations in all paragraphs above as though fully set forth herein.

61.   Defendants U.S. Bank, Wells Fargo, and FATSS violated California Civil Code Section 2923.5 by failing to contact Plaintiffs, in person or by telephone, at least 30 days prior to recording the Notice of Default, on April 4, 2013.  Moreover, there is no declaration by Defendants contained in the Notice of Default that someone tried with due diligence to contact the borrowers as required under Section 2923.5, and if there was it would be false because although signed under oath, the signer had no personal knowledge of whether Plaintiffs were ever contacted; and in fact Plaintiffs were never contacted.

 

62.     Defendants failure to comply with the Notice and Contact requirements of Section 2923.5 renders the Notice of Default and all subsequent proceedings based on said Notice invalid, including both Notices of Trustee's Sale, are invalid and void. *See Mabry v. Superior Court* (2010) 185 Cal. App. 4th 208, 236-37 (Notice of Default which fails to comply with Section 2923.5 is invalid and a non-judicial foreclosure may only proceed if a new, valid Notice of Default is recorded).

WHEREFORE, Plaintiffs pray for relief as set forth below:

**F.  Sixth Cause of Action for Violation of Cal. Civ. Code § 2923.55 By Plaintiffs Against Defendants**

63.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

64.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their respective rights and duties regarding the Note and Trust Deed.

65.     Plaintiffs contend that pursuant to the Loans, Defendants do not have authority to foreclose upon and sell the Property, to demand payments under the Mortgage Note, or to maintain a lien under the Deed of Trust against Plaintiffs' Property.

66.     Plaintiffs are informed and believe and upon that basis allege that Defendants dispute Plaintiffs' contention and instead contend they may properly foreclose upon the Property, demand payments under the Mortgage Note, and maintain a lien under the Deed of Trust against Plaintiffs' Property.

67.     Plaintiffs therefore request a judicial determination of the rights, obligations and interest of the parties with regard to the Property, and such determination is necessary and appropriate at this time under the circumstances so that all parties may ascertain and know their rights, obligations and interests with regard to the Property.

68.     Plaintiffs request a determination that the certificate holders of the ARM Trust 2006-3 own the loan.

 

69.     Plaintiffs request a determination that U.S. Bank and Wells Fargo wrongfully demanded payments under the Note and/or Loan Modification Agreement

70.     Plaintiffs request a determination that neither U.S. Bank nor Wells Fargo can comply with California Civil Code § 2923.55 which requires that any beneficiary causing the recordation of a Notice of Default ("NOD") prove first that they are the Noteholder, prior to recording an NOD.

71.     Plaintiffs request a determination of the validity of the Trust Deed as of the date the Notes were assigned without a concurrent assignation of the underlying Trust Deed.

72.     Plaintiffs request a determination of the validity of the Note.

73.     Plaintiffs request a determination of whether any Defendant has authority to foreclose on the Property.

WHEREFORE, Plaintiffs pray for relief as set forth below:

**G. Seventh Cause of Action for Violation of 18 U.S.C. § 1962 By Plaintiffs Against Defendants**

74.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

75.     Defendants concealed the fact that the Loans were securitized as well as the terms of the Securitization Agreements, including, inter alia: (1) Financial Incentives paid; (2) existence of Credit Enhancement Agreements, and (3) existence of Acquisition Provisions. By concealing the securitization, Defendants concealed the fact that Borrower's loan changed in character inasmuch as no single party would hold the Note but rather the Notes would be included in a pool with other Notes, split into tranches, and multiple investors would effectively buy shares of the income stream from the loans. Changing the character of the loan in this way had a materially negative effect on Plaintiff that was known by Defendants but not disclosed.

76.     The aforementioned acts of Defendants were criminal or punishable as a crime, and there were at least two predicate acts of the same nature which form a "pattern." The "predicate



acts" of fraud, which were accomplished through the U.S. Mail, and the internet, and which are specifically attributable to the Defendants subject to this Count, are:

a.) Bringing suit on behalf of entities which were not the real parties in interest, and which had no standing to sue.

b.) Actively concealing the parties' lack of standing in their standard complaints for foreclosure.

c.) The drafting of the fraudulent affidavits and documents and the subsequent execution of the documents by robo-signers and employees of the document company, servicer or Defendants' law firms, and the filing of fraudulent and forged affidavits as to loan ownership by robo-signers and employees of the Defendants' law firms, and servicers.

77.   Predicate acts of U.S. Bank include those alleged in and incorporated herein by reference in the matter(s) known as *Foster v. Mortgage Electronic Registration Systems, Inc.* USDC WDK Case No. _____ and *Coleman v. Recontrust Company, N.A.* USDC D.U. Case No. 2:10-cv-02099-TC.

78.   Predicate acts of Wells Fargo include those alleged in and incorporated herein by reference in the matter(s) known as *Giles v. Phelan Hallinan & Schmieg, LLP*, 1:11-cv-06239 (D.N.J.) and *Bias v. Wells Fargo & Company.* USDC NDCA Case No. CV-12-0664.

79.   Predicate acts of FATSS include those alleged in and incorporated herein by reference in the matter(s) known as *Levine v. First American Title Insurance Company*, 682 F.Supp.2d 442 (2010) and *Gilmore v. American Mortgage Network et al*, USDC CDCA Case No. CV 12-7935-CAS(Ex).

80.   Predicate acts of MERS include those alleged in and incorporated herein by reference in the matter(s) known as *Bain v. Metropolitan Mortgage Group, Inc. et al*, Washington Case No. 86206-1 and *Campbell v. Baum et al*, USDC EDNY Case No. 1:10-cv-03800-JBW -JO.

81.   The Declaration of Tina Sevillano, a true and correct copy of which is attached hereto as Exhibit C demonstrates predicate acts of fraud by MERS in wrongful foreclosure cases

acts" of fraud, which were accomplished through the U.S. Mail, and the internet, and which are specifically attributable to the Defendants subject to this Count, are:

a.) Bringing suit on behalf of entities which were not the real parties in interest, and which had no standing to sue.

b.) Actively concealing the parties' lack of standing in their standard complaints for foreclosure.

c.) The drafting of the fraudulent affidavits and documents and the subsequent execution of the documents by robo-signers and employees of the document company, servicer or Defendants' law firms, and the filing of fraudulent and forged affidavits as to loan ownership by robo-signers and employees of the Defendants' law firms, and servicers.

77.    Predicate acts of U.S. Bank include those alleged in and incorporated herein by reference in the matter(s) known as *Foster v. Mortgage Electronic Registration Systems, Inc.* USDC WDK Case No. _____ and *Coleman v. Recontrust Company, N.A.* USDC D.U. Case No. 2:10-cv-02099-TC.

78.    Predicate acts of Wells Fargo include those alleged in and incorporated herein by reference in the matter(s) known as *Giles v. Phelan Hallinan & Schmieg, LLP*, 1:11-cv-06239 (D.N.J.) and *Bias v. Wells Fargo & Company*, USDC NDCA Case No. CV-12-0664.

79.    Predicate acts of FATSS include those alleged in and incorporated herein by reference in the matter(s) known as *Levine v. First American Title Insurance Company*, 682 F.Supp.2d 442 (2010) and *Gilmore v. American Mortgage Network et al*, USDC CDCA Case No. CV 12-7935-CAS(Ex).

80.    Predicate acts of MERS include those alleged in and incorporated herein by reference in the matter(s) known as *Bain v. Metropolitan Mortgage Group, Inc. et al*, Washington Case No. 86206-1 and *Campbell v. Baum et al*, USDC EDNY Case No. 1:10-cv-03800-JBW -JO.

81.    The Declaration of Tina Seviliano, a true and correct copy of which is attached hereto as Exhibit D demonstrates predicate acts of fraud by MERS in wrongful foreclosure cases



1   due to the fact that T. Sevillano signed many documents for MERS as a robo-signer, however

2   states that she does "not understand why I was being instructed to sign this document on

3   MERS's behalf." See Ex. D, ¶ 10.  The declarant also states that "I was charged with signing

4   documents for dozens of companies including MERS, BAC Home Loan Servicing, Home123

5   Corporation, Bank of America, N.A., Federal National Mortgage Association, The Bank of New

6   York Mellon, and many others."  See Ex. D, ¶ 5.  This Declaration was used in the matter of

7   *Barocio v. The Bank of New York Mellon et al;* Contra Costa Superior Court Case No. C12-

8   02422.

9       82.     By sending the fraudulent affidavits, assignments and pleadings to the clerks of

10  court, judges, attorneys, and defendants in foreclosure cases. These Defendants intentionally

11  participated in a scheme to defraud everyone, including the Plaintiffs.  They utilized the U.S.

12  Mail and the internet to do so, effecting interstate commerce by contributing to the foreclosure

13  crisis.

14      83.     Defendants knew or should have known that had the truth been disclosed,

15  Plaintiffs would not have entered into the Loans. See *Py v. Pleitner*, (1972) 70 Cal.App.2d 576,

16  582 (some disposition on the part of [defendant] to do equity by tendering the amount of the debt

17  due is a prerequisite to [a] demand for a judgment cancelling the trustee's sale); *MCA Inc. v.*

18  *Universal Diversified Enterprises Corp.* (1972) 27 Cal.App.3d 170, 177.

19      84.     Defendants intended to induce Plaintiffs based on these misrepresentations and

20  improper disclosures.

21      85.     Plaintiffs' reasonable reliance upon the misrepresentations was detrimental.  But

22  for failure to disclose the true and material terms of the transaction, Plaintiffs could have been

23  alerted to issues of concern. Plaintiffs would have known of Defendants' true intentions and

24  profits from the proposed risky loan. Plaintiffs would have known that the actions of Defendants

25  would have an adverse effect on the value of Plaintiffs' home.

26      86.     Defendants' failure to disclose the material terms of the transaction induced

Plaintiff to enter into the loans and accept the Services as alleged herein.

87.     Defendants were aware of the misrepresentations and profited from them.

88.     As a direct and proximate result of the misrepresentations and concealment, Defendants are guilty of malice, fraud and/or oppression. Defendants' actions were malicious and done willfully in conscious disregard of the rights and safety of Plaintiffs in that the actions were calculated to injure Plaintiffs. As such Plaintiffs are entitled to recover, in addition to actual damages, punitive damages to punish Defendants and to deter them from engaging in future misconduct.

89.     They undermined long established rights and sabotaged the judicial process itself by de-emphasizing the importance of, and eventually eliminating, "troublesome" documentation requirements. If a conversion to electronic loan documentation is ever implemented, it is the PEOPLE, by and through their elected representatives, who could ultimately bring about this transition through duly enacted California state legislation.  Most importantly, these changes are to be made BY THE STATES themselves, and not a system implemented nationwide by any Federal body.

90.     The Plaintiffs are entitled to judgment in the amount of three times their actual damages, plus costs under 18 U.S.C. §1964[c]. The Defendants have conspired together to violate 18 U.S.C. §1962[d], by committing fraud and utilizing the US Mail and the internet. The Defendants agreed upon the same criminal objective to wit: the theft of real property through illegal foreclosure liens. Each conspirator is reasonable for the actions of the others and the results of the conspiracy as a whole.  By engaging in a pattern of racketeering activity, specifically "mail or wire fraud," the Defendants subject to this Count participated in a criminal enterprise affecting interstate commerce. A separate count of Mail Fraud took place each and every time a fraudulent pleading, Affidavit, Promissory Note Assignment, mortgage or mortgage assignment was sent by a Defendant through the use of the US mail. Likewise is true for any documents sent via electronic mail as would be the case as part of a Federal action electronically filed with the Court. Such would constitute a separate act of wire fraud.

91.     The criminal enterprise affects interstate commerce in numerous ways. It is used to conceal the true ownership of mortgage loans from the general public, including investors, borrowers, the SEC, the IRS and the Courts.

92.     But for the Conspiracy, investors would be enabled to have a clearer picture of the assets and debts of large banking and financial institutions in which they may consider investing.

93.     As the result of the RICO enterprise of which these actions were part, the plaintiffs have suffered damages, in that they are at risk of losing their home. These predicate acts are related. They share a common purpose, defrauding the Plaintiffs borrower of their money and property. They share the common themes of "non-documentation" and concealment of the real parties in interest.

94.     The predicate acts satisfy the RICO continuity requirement: they extend from in or about 1998 through and continue unabated at the present time, which meets the definition of "open-ended" continuity. In the alternative, the participants in the RICO enterprise engaged in a pattern of racketeering activities continuously for a period of time exceeding ten years in duration, which as a matter of law suffices to establish "close-ended" continuity.

95.     As the result of the RICO enterprise of which these actions were part, the Plaintiffs have suffered damages, in that they are under threat of losing their asset to an entity who cannot prove it owns such asset in question. The real parties in interest to the loan have already been paid.  The mortgage loan possessed by the Plaintiffs was not subject to being foreclosed upon, and the mortgage amount recorded in the public record of the properties is the measure of the damages suffered by the Plaintiffs in relation to U.S. Bank, Wells Fargo, MERS, and/or FATSS.

96.     The plaintiffs are entitled to judgment in the amount of three times their actual damages, plus costs under 18 U.S.C. §1964[c].

97.     Those who provide support for an illegal enterprise are liable for the actions of those who commit the criminal acts, regardless of whether they participated in that particular criminal act.

 

98.     The quick sale by the lender of its interest, at what appears to be a loss, would have at first seemed inexplicable, but when considered with the benefit of hindsight, proof of these quick transfers would have been evidence that the lender knew in advance that property values would soon decline. Additionally, the securitizers/underwriters, hedged their bets beforehand with multiple collateral contracts, far in excess of their original investment, thereby banking on and benefiting on the fact that the MBS would eventually fail. Concealed Identity by changing "servicers" on these loans, and by sending out notices of such changes drafted also in intentionally ambiguous verbiage, the bankers behind the scenes cooperated in obscuring the truth as to who had the right to receive the proceeds of the loans, and to foreclose in the event of non-payment. The loans were grouped into "pools" and sold multiple times, thereby increasing profits for the wrongdoers. These "securitized debt pools" were sold on the stock market and elsewhere, and in this manner affected interstate commerce. The real parties in interest also in many instances collected mortgage insurance upon "default."

99.     The revolutionary ways in which words were utilized all shared one characteristic: they made it more difficult to determine who had the right to receive and utilize for their own purposes the payments made on the loan by the borrower. For example, "mortgagee" began to have a meaning other than "lender." "Servicer" arose to prominence and was and is used to further obscure important truths. Specifically, the "servicer" does not hold the true beneficial interest in the mortgage.

100.    Typically, the Defendants will not release any further information on the subject, whether it is requested in discovery in a foreclosure action or in any other context. The conspirators set about to confuse everyone as to who owned what. They created a truly effective smokescreen which has left the public and most of the judiciary operating "in the dark" through the present time.

 

101.    The conspirators intended to maintain an absolute stranglehold on the American economy for many decades, if not centuries, into the future. This could only be accomplished if the scheme was able to evolve over time in a changing regulatory and consumer environment. The point is that the conspirators adjusted the American lending system and the legal system governing it in a way designed to most effectively gratify their greed motivated crimes over the longest period of time. Through this revolution in the use of words and ephemeral concepts such as the "corporation," the conspirators, including the present Defendants, have by and- large been successful in changing the paradigm so that the rights of individuals are In contradiction with the ownership proclamation contained on rules of the Pooling and Servicing Agreement, and as previously addressed.

102.    As the conspirators and present Defendants have long intended, certain important terms in the mortgages and other legal documents are devolving into a state of meaninglessness. Even the names of the mortgage and lending institutions are tinkered with and interchanged so often that it is difficult to keep track of the constantly shifting parameters of the series of alleged mergers, assertions of subsidiary relationships, "divisions," and the like with which the American economy and consumer populace are deluged in advertisements and mortgage documents.

103.    This is not some random trend which resulted from the mortgage crisis. It is, instead, just another tactic in the vast scheme which ultimately caused it. The end result of the continued actions is that the mortgages and associated documents come to mean whatever their proponents wish them to mean.

104.    The conspirators of course did not want there to be any documentation which could incriminate them or later potentially be used as evidence of their crimes and evidence to the investors of the MBS or the IRS that the loans were illegitimate.

105.    They did not want to pay the fees associated with recording mortgages and they did not want to be bothered with the trouble of keeping track of the originals.



106.   Plaintiffs have suffered damages as a direct and proximate result of Defendants' actions as herein described as they suffered a diminution in value to the Subject Property. These damages are irreparable should the Deed of Trust and foreclosure documents be held enforceable.   Plaintiffs seek an injunction because real property is considered unique in California, and monetary damages are deemed inadequate to compensate Plaintiffs for the loss thereof. *Stockton v. Newman* (1957) 148 Cal. App. 2d 558, 564; however, at this time, Plaintiffs' damages include but are not limited to loss of equity and diminution in value of the Subject Property.

107.   Pecuniary damages sustained by Plaintiffs as a result of the falsely recorded documents and unperfected sale of Plaintiffs' Deed of Trust to the securitized trust, and pattern. These actions caused economic damages to Plaintiffs also because they demonstrate a false claim of right, title or interest in the subject property which gives rise to a need for policy endorsements for title insurance, settlement of a claim shown on a title report, and/or a significant dissuasive factor for any prospective purchaser inspecting the property for sale, and/or its disclosures, any and all of which factors negatively affected and continue to affect the purchase price and vendibility of the Subject Property in an amount to be proven at trial.

108.   The aforementioned wrongful actions taken by Defendants made it necessary for Plaintiffs to retain attorneys and to bring this action to cancel the instruments casting doubt on Plaintiffs' title. Therefore, Plaintiffs are entitled to recover attorneys' fees and costs incurred in cancelling the instrument.   The exact amount of such damages is not known to Plaintiffs at this time, and Plaintiffs will move to amend this complaint to state such amount when the same becomes known, or on proof at the time of trial.

WHEREFORE, Plaintiffs pray for judgment against defendants and each of them, as set forth below:

**G.  Seventh Cause of Action for Unfair Business Practices Act (California Business and Professions Code Section 17200) by Plaintiffs Against All Defendants**

109.    Plaintiffs re-allege and incorporate by reference all prior paragraphs in this complaint, as though fully set forth herein.

110.    California Business and Professions Code Section 17200 prohibits unlawful, unfair, or fraudulent business practices.  Section 17200 is a derivative cause of action and Plaintiffs' ability to pursue this cause of action depends on the success or failure of their substantive causes of action.

111.    Defendant Defendants engaged in business practices that violate Section 17200 because it executed and recorded the April 4, 2013 Notice of Default, knowing that it did not hold the beneficial interest in the Deed of Trust, and thus lacked the legal power to initiate a foreclosure.

112.    Both Defendants engaged in business practices that violate Section 17200 when they executed and recorded the false Assignment(s) of Deed of Trust.  As discussed above, Plaintiffs' loan was securitized and sold before the Assignment(s) were executed, and thus they had no interest in the Deed of Trust to transfer to U.S. Bank on or after November 30, 2009.

113.    Basing any attempt to foreclosure on Plaintiffs' home on such false documents violates California's statutory scheme for non-judicial statutory and is wrongful and constitutes unlawful and unfair business practices.  *See* Cal. Civ. Code § 2924 *et seq.*  Thus, all Defendants engaged in business practices which violate Section 17200.

114.    The foregoing acts have caused substantial harm to Plaintiffs' and if Defendants are permitted to continue engaging in such wrongful and unlawful business practices, Plaintiffs will not be the only California consumers harmed.

115.    Based on the violations of Civil Code Section 2924 *et seq.*, Defendants violated Business and Professions Code Section 17200.  As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered an injury in fact because a cloud has been placed on Plaintiffs'

 

1   title and their interest in the Subject Property has been placed in jeopardy. These injuries have

2   caused Plaintiffs' monetary damages in an amount to be proved at trial.

3       116.    Pursuant to California Code of Civil Procedure Section 1021.5, Plaintiffs are

4   entitled to recover their reasonable attorney's fees, costs, and expenses incurred in bringing this

5   action.

6       WHEREFORE, Plaintiffs prays for judgment against defendants and each of them, as set

7   forth below:

8                           **V. Prayer for Relief**

9       WHEREFORE, Plaintiffs pray for a judgment against the Defendants, and each of them,

10  as follows:

11      1. For a judgment declaring that the April 26, 2006 Deed of Trust and the August 21,

12  2012 Loan Modification Agreement (Deed of Trust) are invalid and any subsequent proceedings

13  based on these documents are also invalid.

14      2. For a temporary restraining order, a preliminary injunction, and a permanent

15  injunction, all enjoining Defendants, and each of them, and their respective agents, servants, and

16  employees, and all persons acting under, in concert with, or for them, from asserting any interest

17  in the Subject Property or otherwise attempting in any manner to dispossess Plaintiffs from

18  possession of the Subject Property; or taking any action to enforce any other remedy purportedly

19  provided to them by the Deed of Trust;

20      3. For a judgment forever enjoining said Defendants, and each of them, from claiming

21  any estate, right, title or interest in the subject property;

22      4. For a judgment forever enjoining said Defendants, and each of them, from claiming

23  any estate, right, title or interest in the subject property;

24      5. For an order compelling said Defendants, and each of them, to transfer legal title and

25  possession of the subject property to Plaintiff herein;

26      6. For damages according to proof at trial;

 

7. For costs of suit and attorneys' fees herein incurred;

8. For punitive damages according to proof at trial; and

9. For such other relief as the Court may deem just and proper.

<u>**Demand for Jury Trial**</u>

Plaintiffs hereby demand a trial by jury of each and every claim so triable.

DATED: August 13, 2013            Respectfully submitted,

Megan Dailey
Attorneys for Plaintiffs
70 Doray Drive, Suite 16
Pleasant Hill, CA 94523
925-849-5525

Exhibit A

RECORDING REQUESTED BY
FIRST AMERICAN TITLE
ESCROW # 4331-7S4409-053

Recording Requested By:
FAMILY LENDING SERVICES, INC.



2006160031    04/25/2006 08:30 AM
OFFICIAL RECORDS OF ALAMEDA COUNTY
PATRICK O'CONNELL
RECORDING FEE:        73.00

And After Recording Return To:
FAMILY LENDING SERVICES, INC.
18581 TELLER AVENUE, SUITE 175
IRVINE, CALIFORNIA 92612
Loan Number: 10036083

22  PGS

RECORDING REQUESTED BY
FIRST AMERICAN TITLE

———————————————— [Space Above This Line For Recording Data] ————————————————

## DEED OF TRUST

MIN: 1000710-0010036083-5

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "Security Instrument" means this document, which is dated APRIL 7, 2006              , together
with all Riders to this document.
(B)  "Borrower" is CHRISTOPHER P. ZAPATA AND ELAINE A. ZAPATA, HUSBAND
& WIFE AS JOINT TENANTS

Borrower is the trustor under this Security Instrument.
(C)  "Lender" is FAMILY LENDING SERVICES, INC.

Lender is a CORPORATION                                                              organized
and existing under the laws of CALIFORNIA
Lender's address is 18581 TELLER AVENUE, SUITE 175, IRVINE, CALIFORNIA
92612

(D)  "Trustee" is S.P.S. AFFILIATES, A CALIFORNIA CORPORATION
15326 ALTON PARKWAY, IRVINE, CALIFORNIA 92618

(E)  "MERS" is Mortgage Electronic Registration Systems, inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security
Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number
of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F)  "Note" means the promissory note signed by Borrower and dated APRIL 7, 2006
The Note states that Borrower owes LenderEIGHT HUNDRED THIRTY-SIX THOUSAND AND
00/100                          Dollars (U.S. $ 836,000.00        ) plus interest.

Borrower Initials: _CZ_  _EX_ _____  _____  _____  _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                          Page 1 of 14                    DocMagic℮Ⓕⓞⓡⓜⓢ 800-649-1362
                                                                         www.docmagic.com

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MAY 1, 2036

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY         of         ALAMEDA
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

Borrower Initials: _____ _____ _____ _____ _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                  Page 2 of 14

DocMagic EForms  800-649-1362
www.docmagic.com



SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 461-0037-064

which currently has the address of  288  ISLE  COURT

[Street]

HAYWARD                           , California  94545        ("Property Address"):

[City]                                                        [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:  to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:

1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  Borrower shall also pay funds for Escrow Items pursuant to Section 3.  Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15.  Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

Borrower Initials: _____  _____   _____   _____   _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS        DocMagic EForms  800-649-1362
Form 3005 01/01                          Page 3 of 14                                www.docmagic.com



obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   Application of Payments or Proceeds.  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   Funds for Escrow Items.  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender

Borrower initials: _____  _____   _____   _____   _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS      DocMagic &#9758; 800-649-1362
Form 3005 01/01                                      Page 6 of 14                                    www.docmagic.com

shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Borrower initials: _____ _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                    Page 5 of 14                         DocMagic eForms 800-649-1362
                                                                                        www.docmagic.com

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   **Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   **Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

Borrower Initials:

8.   **Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  **Mortgage Insurance.**  If Lender required Mortgage insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.  If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.  If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.  Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance.  Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve.  Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law.  Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed.  Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses.  These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.  These

Borrower Initials: _____ _____ _____  _____  _____



agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given. Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower Initials:  _CE_   _MW_   _____   _____   _____   _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS                 DocMagic ⟨Ɵǝᴀᴍ☎ 800-649-1362
Form 3005 01/01                                     Page 8 of 14                                                www.docmagic.com

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18. any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender

Borrower Initials: _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                        Page 9 of 14

DocMagic *600-649-1362*
www.docmagic.com

specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note

Borrower Initials: _____ _____

and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The

Borrower initials: _____ _____ _____ _____ _____ _____



notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Borrower Initials: _CZ_  _VU_  ____  ____  ____  ____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
CHRISTOPHER P. ZAPATA          -Borrower

_____ (Seal)
ELAINE A. ZAPATA               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

Witness:                       Witness:

_____   _____

State of California                          )
                                            ) ss.
County of Santa Clara                        )

On April 17, 2006 before me, Robert Van Steen Notary Public in

personally appeared  CHRISTOPHER P. ZAPATA, ELAINE A. ZAPATA

~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) ~~is/~~are subscribed to the within instrument and acknowledged to me that ~~he/she/~~they executed the same ~~in his/her/~~their authorized capacity(ies), and that by ~~his/her/~~their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

```
ROBERT J. VAN STEEN JR.
COMM. NO. 1487171
NOTARY PUBLIC - CALIFORNIA
SANTA CLARA COUNTY
COMM. EXPIRES MAY 7, 2006
```

NOTARY SEAL

_____
NOTARY SIGNATURE

_____
(Typed Name of Notary)

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                           Page 14 of 14                    DocMagic eForms  800-649-1362
                                                                          www.docmagic.com

Exhibit B



# CERTIFIED SECURITIZATION ANALYSIS, LLC

446 Old County Road
Pacifica, CA 94044
*www.securitizationanalysis.com*

# MORTGAGE SECURITIZATION AUDIT & ANALYSIS REPORT
## January 18, 2013



### Prepared for:
**Christopher P. & Elaine A. Zapata**
**288 Isle Court**
**Hayward, CA. 94545**

**Disclosure:** You have engaged Certified Securitization Analysis, LLC (CSA) to examine your real estate documents. This information is not to be construed as legal advice or the practice of law, pursuant to *Business and Professions Code § 6125 et seq*, it is the intent of CSA, its members, auditors and independent contractors, not to engage in activities that could be considered the practice of law by conduct exhibiting any of the following practices: "...the doing and/or performing of services in a court of justice in any matter depending therein throughout the various stages and in conformity with the adopted rules of procedure. It includes legal advice and counsel and the preparation of legal instruments and contracts by which the legal rights are secured although such matter may or may not be depending in a court."

 

## Table of Contents

SECTION I: BORROWER(S) AND LOAN INFORMATION.................................................5
Borrower(s) and Property Information...........................................................................3
Original Mortgage Loan Transaction Summary.............................................................3
Original Loan/Mortgage Transaction Parties................................................................4

SECTION II: MORTGAGE SECURITIZATION..............................................................5
The Securitization Transaction.....................................................................................5
   Introduction.............................................................................................................5
   The Origins of Mortgage Securitization...................................................................6
   Mortgage Securitization by Public and Private Label Placements.............................6
   The Borrower (Mortgagor) and the Originating Lender (Mortgagee)..........................7
   The Securitization Parties and Their Roles.............................................................12
   Real Estate Mortgage Investment Conduits ("REMICS")..........................................16
   Standing in the Event of Mortgage Default.............................................................17
   Maintaining a Valid Lien on a Securitized Mortgage...............................................18
   Proper Securitization Process/Transaction Flow Chart (Maintaining a Valid Lien)...19
Forensic Audit - Mortgage Loan Securitization.............................................................20
Securitization Participants Identified............................................................................24
   Simplified Flow Chart of a Proper Process of Securitization...................................25
   The Feeding Frenzy Period for Mortgage Securitization (2002-2007)......................38
   The Subverted Securitization Process....................................................................46
   The Legal Issues..................................................................................................46
   Subverted Securitization Process/Transaction Flow Chart......................................48
   Role of the Loan Servicer.....................................................................................49
   The Servicing Process Flow Chart.........................................................................49

SECTION III: FORECLOSURE PROCESS REVIEW.......................................................51
Chain of Title Review................................................................................................51
   Mortgage Loan Documents and Foreclosure Process Review..................................54
   Mortgage Securitization Review............................................................................65

SECTION IV: DEFECTS AND DEFICIENCIES, CONCLUSION........................................67
Loan Modification.....................................................................................................67
Mortgage Securitization Issues..................................................................................67
Foreclosure Action Deficiencies & Defects.................................................................69
Conclusion...............................................................................................................72
Appendix of Recent Commentary...............................................................................77

Copyright © 2010, 2011, 2012, 2013.  Lawrence M. Asuncion. All Rights Reserved.

 

# SECTION I: BORROWER(s) AND LOAN INFORMATION

## Borrower(s) and Property Information

| BORROWER/MORTGAGOR | |
|---|---|
| Christopher & Elaine Zapata | |
| CURRENT ADDRESS | SUBJECT ADDRESS |
| 288 Isle Court Hayward, CA. 94545 | 288 Isle Court Hayward, CA. 94545 |

## Original Mortgage Loan Transaction Summary

| | | | |
|---|---|---|---|
| Origination Date: (DOT Recorded 4/26/2006) | April 7, 2006 | Initial Interest Rate: | 5.750 % |
| Loan Maturity: (30-Year Loan): | May 1, 2036 | Interest Life Cap: | 10.750 % |
| | | Interest Life Floor: | 2.250 % |
| Loan Amount: | $836,000.00 | Interest-Only Period | 60 Months |
| Original LTV | 80.00 % | Starting Mortgage Payment: | $4,005.83 |
| FICO Score (At Loan Origination) | 734 | Beginning: | June 1, 2006 |
| Occupancy: | Owner Occupied | Original Loan Number: | 10036083 |
| Loan Purpose: | Purchase | Servicing Assigned Loan Number: | 1205318220 |
| Property Type: | Planned Unit Development | MERS MIN: 1000710-0010036083-5 | |
| Loan Program | Interest Only Adjustable Rate (5/25) Note | Rate Change Date: (And every 12th month thereafter) | May 1, 2011 |
| | | Margin | 2.250 % |
| Riders: | Fixed/Adjustable Rate Rider; PUD Rider | Index | 12-Month LIBOR |

Copyright © 2010, 2011, 2012, 2013. Lawrence M. Asuncion. All Rights Reserved.

 

## Original Loan/Mortgage Transaction Parties

| TITLE COMPANY | INITIAL LOAN SERVICER | MORTGAGEE NOMINEE/BENEFICIARY |
|---|---|---|
| FIRST AMERICAN TITLE | SELECT PORTFOLIO SERVICING | MORTGAGE ELECTRONIC REGISTRY SYSTEMS, INC. ("MERS") MIN: 1000710-0010036083-5 |
| ORIGINAL TABLE LENDER | MORTGAGE TRUSTEE | CURRENT LOAN SERVICER |
| FAMILY LENDING SERVICES, INC. | S.P.S. AFFILIATES | AMERICA'S SERVICING COMPANY, a division of WELLS FARGO HOME MORTGAGE |

Copyright © 2010, 2011, 2012, 2013. Lawrence M. Asuncion. All Rights Reserved.

 

## SECTION II: MORTGAGE SECURITIZATION

### The Securitization Transaction

#### Introduction

Mortgage securitization is a financial transaction whereby hundreds of mortgage loans are pooled together and converted into securities. The loans are collected and packaged by a securitization "Sponsor" and sold to a "Depositor" who in turn sells and transfers these loans into a tax-advantaged trust entity, which is a special purpose vehicle (SPV) that holds the mortgage loans as collateral on the securities traded and sold by Wall Street and other firms to investors. The securitized mortgages held in the mortgage-backed securities (MBS) trust entity are rated and classified in "tranches" (with each tranche representing a different level of risk & return). The investors ("Certificate Holders") purchase the rights to cash generated from the borrowers' (mortgagors') principal and interest payments of the loans.

With securitization of the mortgages, the "Originating Lenders" are then able to take these loans (a non-liquid asset) off their books, eliminating the need to maintain the required capital reserves for contingency against default.

### MORTGAGE SECURITIZATION



Copyright © 2010, 2011, 2012, 2013. Lawrence M. Asuncion. All Rights Reserved.



## The Origins of Mortgage Securitization

Beginning in the early 1970s, the first mortgage-backed securities were created and offered as a way for the government and government sponsored entities (GSE) such as the Government National Mortgage Association (GNMA or Ginnie Mae), the Federal Home Loan Mortgage Corporation (FHLMC or Freddie Mac), and the Federal National Mortgage Association (FNMA or Fannie Mae) to provide greater liquidity to the residential markets and promote American homeownership. Freddie Mac and Fannie Mae followed suit in an effort to create deeper mortgage markets. Investors were attracted to purchasing these insured mortgage pool certificates than investing in (buying) individual home loans, which would require a more complex and expensive operation than ownership of financial securities requires.

Among the reasons such new innovation in financing (securitization) added greater liquidity to the market is that the mortgage and asset-backed securities financial structure allowed investors with different risk tolerance to choose different rates of return as well as options in timing of receipt of investment income (principal repayment & interest). The securitization vehicle, a mortgage-backed securities trust (MBS trust) receiving pass-through income is typically structured such that a certain group of investors (certificate holders) receives a lower rate of income, but in exchange, is not exposed to first losses incurred in the event of mortgage default. Other investors with an interest in the same securitized mortgage pool may bear the first loss position in exchange for higher income from the schedule mortgagor's (borrower's) payments received by the MBS trust. The cash flows from the pooled mortgages securing the MBS trust income are thus aggregated, and then re-divided into "tranches" owing to each class of bond issued by the Trust, each with a rating by independent credit rating agencies such as Moody's, Fitch and Standard & Poor's.

Fast forward to the present date, the market for mortgage and asset-backed securities has grown significantly to a size surpassing even the U.S. Treasury Market ($4 trillion) and all corporate bonds ($3.1 trillion). The mortgage-backed securities market is the largest segment of the U.S. bond market with approximately $4.6 trillion in mortgage-related debt outstanding in 2007 and an additional $1.5 trillion of asset-backed securities outstanding, the majority of which are backed by home equity loans.

## Mortgage Securitization by Public and Private Label Placements

Mortgage securitization may be issued by public and/or private entities. Public placements are originated by Government Sponsored Entities (GSE) such as Fannie Mae, Freddie Mac and Ginnie Mae and normally involve a single form of an investment bond called Pass-Through Certificates. Private-label placements represent mortgages that have been aggregated on the secondary market by private investors and are done in tranches to represent the varying levels of risks associated with them.

Copyright © 2010, 2011, 2012, 2013.  Lawrence M. Asuncion. All Rights Reserved.

 

## The Borrower (Mortgagor) and the Originating Lender (Mortgagee)

The market for financial assets begins with a borrower requesting funds and a lender extending a loan. The relationship between the loan originator and the borrower represents the first necessary step in both conventional lending and the asset-backed securitization process. With the securitization model, the borrowers' previous bilateral relationship with a lender is replaced by the pooling of multiple borrowers' loans, and the ultimate funding of a loan coming from multiple investors as compared to a single lender.

The securitization process starts when a potential borrower needs a loan. The lender funds the loan in exchange for the borrower's contractual promise to pay the loan's principal with interest (promissory note), and the borrower's grant of a security interest in certain collateral, most often the property purchased or refinanced with the loan proceeds (Mortgage or Deed of Trust, depending on the state in which the loan originates.  The security instrument in the present case is a Mortgage.  For the purposes of the charts in this report, references to Deeds of Trust and Mortgages are interchangeable). See Chart 1 (next page).



**Chart 1: Transfer of Mortgage from a Borrower to a Lender;
Contracts - Loan Documents between Borrower and Lender**

Thereafter (Chart 2), the lender sells/transfers pooled mortgages to a "Purchaser," who may be the securitization "Sponsor," usually an affiliate company of the lender or an investment bank.  The Purchaser may also purchase other loans from other lenders, benefiting from significant economies of scale, with a typical MBS trust composed of thousands of pooled mortgage loans worth $500 million to more than $1 billion.

Copyright © 2010, 2011, 2012, 2013.  Lawrence M. Asuncion. All Rights Reserved.



**Chart 2: Transfer of Mortgages from Lender to Purchaser; Contracts - Mortgage Loan Purchase Agreement (MLPA) & Interim Service Agreement (ISA) between the Lender and Purchaser**

The following are the advantages and benefits to the originating lender packaging and selling pooled mortgages using the structure of a securitization:

1. Immediate liquidity on otherwise illiquid assets such as 30-year mortgages.
2. Maximize the amount obtained from selling and transferring the mortgages and immediately realize the profits.
3. Avoid, often through associated credit default insurance, carrying on the lender-transferor's balance sheet reserves and contingent liability, thereby escaping any reserve requirements imposed upon contingent liabilities that would otherwise be carried on the transferor's books.
4. Use the liquid funds to enter into new loan transactions and to earn more profits that are immediately realized... again and again (as well as the profits, fees and charges associated with the new transactions... and so on).
5. Insulate the lender-transferor from liability and moves the liability to the insurers.
6. Maximize earnings by transferring the assets so that the assets cannot be reached by the creditors of the transferor institution or by the trustee in the event of the originator's bankruptcy. (By being *"bankruptcy-remote"* the value to investors of the illiquid assets is increased and investors are willing to pay more.)
7. Control management of the illiquid asset by being appointed as the servicer of the mortgage and earn service fees.
8. Increase the value of the Trust securities through their issuance by a tax-free pass-through Trust entity so that only the investor who receives income from the Trust is taxed. This avoids "double taxation" of both the trust and the investor.
9. Leverage the mortgage transaction by creating mortgage-backed certificates that can be pledged as an asset, which can be re-securitized and re-pledged to create new financial

 

securities [collateralized debt obligations or CDOs] secured by the cash flows not of the loans, but of the MBS whose cash flows are derive from them.

The loan originator/originating lender typically sells the pooled loans under a **Mortgage Loan Purchase Agreement (MLPA),** which contains warranties and representations on the loans sold. Between the sale date of the loan and the closing date of the securitization transaction, the lender will agree to continue to "service" (collect upon) the loan. Either the MLPA or an Interim Service Agreement (ISA) provides for this interim servicing arrangement. The lender expressly acknowledges that the Purchaser is buying these mortgages for the purpose of securitization. The borrower's commitment to repay the loan and the lender's security backing the loan will be evidenced by loan documents namely the mortgage and a note.

The Purchaser (often along with other purchasers) sells loans to the "Depositor", a *bankruptcy-remote entity* setup for the purpose of "depositing" loans in a securitization trust. The Depositor buys loans from each purchaser under a further MLPA between purchaser and depositor. The Purchaser-Depositor MLPA [in this instance, the agreement is entitled the Mortgage Loan Sale and Assignment Agreement ["MLSAA"]] may or may not assign the rights under the lender-purchaser MLPA.  The lender and/or the Purchaser also provides the Depositor with indemnity for prospectus information and warranting/representing "truthfulness of information," and the depositor then places such information and indemnities in the prospectus (and prospectus supplement) or other offering documents.



Chart 3: Transfer of Mortgages from Purchaser to Depositor;
Contracts - MLPA between the Purchaser and Depositor

Copyright © 2010, 2011, 2012, 2013   Lawrence M. Asuncion. All Rights Reserved.

 

After buying the loans from the purchaser(s), the depositor holds the loans (for a "split second") before depositing the loans into an issuer securitization trust. Using a "shelf registration," the Depositor has often filed a prospectus describing the securitization practices. Then, for each subsequent securitization, the Depositor files a prospectus supplement describing that specific securitization transaction. These offering documents describe the securitization transaction parties, the classes of bond certificates to be issued, the yield on the various tranches/classes of certificates, the loan pool, the trust administration, and certain legal matters (See Chart 4). The MLPA representations and warranties may also be stated in the one or more offering documents. **The Pooling and Servicing Agreement (PSA)**, which is the operative legal contract that creates the MBS Trust and governs its terms, operation and administration, provides for the transfer of the loans on a specified closing date. The PSA repeats the key MLPA terms or provisions, or set out other terms relevant to the MLPA.



**Chart 4: Depositor "depositing" pooled loans/mortgages to an Issuer Trust for loan pool; Depositor prepares Prospectus (& Supplemental Prospectus); Contracts - Pooling and Service Agreement (PSA) between the Loan Servicer, Depositor and Trust**

The MBS trust created by the Purchaser for the Issuer is called a **Special Purpose Vehicle (SPV)**. The SPV is organized to be a **Qualified Special Purpose Entity (QSPE)**, which receives a favorable "pass-through" or single tax treatment based on strict IRS rules. To avoid the double taxation of the trust and the certificate holders (multiple investors who purchased the bond certificates from the

Copyright © 2010, 2011, 2012, 2013.  Lawrence M. Asuncion. All Rights Reserved.

 

trust), the trust is classified as a **Real Estate Mortgage Investment Conduit (REMIC)**, a category of QSPE. Upon qualification as a REMIC, the income of the trust (scheduled mortgagors' payments) is taxed only at the Certificate Holders' (Investors') level.



**Chart 5: Depositor "depositing" pooled loans/mortgages to an Issuer Trust for loan pool;**
**Depositor prepares Prospectus (& Supplemental Prospectus);**
**Contracts – PSA between the Loan Servicer, Depositor and Trust.**

The PSA provides for the trust administration through the Trustee and Servicer. The SPV or the trust transfers the right to service the collection of income from the pooled assets to a third party or in most cases to the loan originator/originating lender itself.  The Servicer collects borrower obligations on the loans subsequent to the securitization closing date on behalf of the trustee. The rights to service the mortgage loans are called Mortgage Servicing Rights or MSR. The rights to service mortgage assets are also considered as assets with recognized value. The Trustee is the nominal legal owner of the trust assets for the benefit of the investors (Certificate Holders).

Copyright © 2010, 2011, 2012, 2013.  Lawrence M. Asuncion. All Rights Reserved.



## SECURITIZATION PARTICIPATIONS



**Chart 6: Securitization Participants (total picture)**

## The Securitization Parties and Their Roles

(Note: The name of the Securitization Participants in this specific case in all caps is underlined)

1. **Loan Originator/Originating Lender.** FAMILY LENDING SERVICES, INC. ("*Table Lender*") The "originator" is the lender that provided the funds to the borrower (mortgagor) at loan closing or close of escrow. Usually the originator is the named "Lender" (mortgagee) in the Promissory Note and in the security instrument (Mortgage or Deed of Trust). Majority of lenders/originators securitize loans because of the numerous advantages and benefits previously mentioned.

2. **Warehouse Lender.** The Originator probably borrowed the funds on a line of credit from a short-term revolving warehouse credit facility (commonly referred to as a "warehouse lender"); nevertheless the money used to close the loan were technically and legally the Originator's funds. Warehouse lenders are either "wet" funders or "dry" funders. A wet funder will advance the funds to close the loan upon the receipt of an electronic request from the originator. A dry funder, on the other hand, will not advance funds until it actually receives the original loan documents duly executed by the borrower.

3. **Securitizer: Sponsor, Aggregator or Purchaser.** DLJ MORTGAGE CAPITAL, INC. The Sponsor is the party that securitizes the pool of mortgage loans. This means that it was the final aggregator of the

Copyright © 2010, 2011, 2012, 2013.  Lawrence M. Asuncion. All Rights Reserved.



loan pool and then sold the loans directly to the Depositor, which in turn sold them to the securitization trust. In order to obtain the desired ratings from the independent ratings agencies such as S&P, Moody's or Fitch, the Sponsor normally is required to retain some exposure to the future value and performance of the loans in the form of purchases of the most deeply subordinated classes of the securities issued by the Trust, i.e., the classes last in line for distributions and first in line to absorb losses (commonly referred to as the "first loss pieces" of the deal).

**4. Depositor.** <u>CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.</u> The Depositor exists for the sole purpose of enabling the transaction to have the key elements that make it a securitization in the first place: a "true sale" of the mortgage loans to a "bankruptcy-remote" and "FDIC-remote" purchaser. The Depositor purchases the loans from the Sponsor, sells the loans to the Trustee of the securitization trust, and uses the proceeds received from the trust to pay the Sponsor for the Depositor's own purchase of the loans. It all happens simultaneously, or as nearly so as theoretically possible. The length of time that the Depositor owns the loans has been described as "one nanosecond."

The Depositor has no other functions, so it needs no more than a handful of employees and officers. Nevertheless, it is essential for the "true sale" and "bankruptcy-remote"/"FDIC-remote" analysis that the Depositor maintains its own corporate existence separate from the Sponsor and the Trust and observes the formalities of this separate corporate identity at all times. The "Elephant in the Room" in all structured financial transactions is the mandatory requirement to create at least two "true sales" of the notes and mortgages between the Originator and the Trustee for the Trust so as to make the assets of the Trust both "bankruptcy" and "FDIC" remote from the originator. And, these "true sales" will be documented by representations and attestations signed by the parties; by attorney opinion letters; by asset purchase and sale agreements; by proof of adequate and reasonably equivalent consideration for each purchase; by "true sale" reports from the three major "ratings agencies" (Standard & Poor's, Moody's, and Fitch) and by transfer and delivery receipts for mortgage notes endorsed in blank.

**5. Trustee.** <u>U.S. BANK NATIONAL ASSOCIATION.</u> The Trustee is the nominal owner of the loans on behalf of the Certificate Holders (Investors) at the end of the securitization transaction. Like any trust, the Trustee's powers, rights, and duties are defined by the terms of the transactional documents that create the trust, and are subject to the terms of the trust laws of some particular state, as specified by the "Governing Law" provisions of the transaction document that created the trust. The vast majority of the residential mortgage backed securitized trusts are subject to the applicable trust laws of Delaware or New York. The "Pooling and Servicing Agreement" (or, in "Owner Trust" transactions as described below, the "Trust Indenture") is the legal and governing document that creates these common law trusts and the rights and legal authority granted to the Trustee is no greater than the rights and duties specified in this Agreement. The Trustee is paid based on the terms of each structure. For example, the Trustee may be paid out of interest collections at a specified rate based on the outstanding balance of mortgage loans in the securitized pool; the Master Servicer may pay the Trustee out of funds designated for the Master Servicer; the Trustee may receive some on the interest earned on collections invested each month before the investor remittance date; or the Securities Administrator may pay the Trustee out of their fee with

Copyright © 2010, 2011, 2012, 2013.  Lawrence M. Asuncion.  All Rights Reserved.

 

no charges assessed against the Trust earnings. Fee amounts range between a low of .0025% to as high as .009%.

6. **Indenture Trustee and Owner Trustee**. Most private-label securitizations are structured to meet the Internal Revenue Code requirements for tax treatment as a "Real Estate Mortgage Investment Conduit ("REMIC"). However some securitizations (both private-label and Government Sponsored Enterprises or GSEs) have a different, non-REMIC structure usually called an "Owner Trust." In an Owner Trust structure the Trustee roles are divided between an Owner Trustee and an Indenture Trustee. As the names suggest, the Owner Trustee owns the loans; the Indenture Trustee has the responsibility of making sure that all of the funds received by the Trust are properly disbursed to the investors (bond holders) and all other parties who have a financial interest in the securitized structure. These are usually Delaware statutory trusts, in which case the Owner Trustee must be domiciled in Delaware.

7. **Servicer(s)**. WELLS FARGO BANK, N.A., SELECT PORTFOLIO SERVICING, INC., COUNTRYWIDE HOME LOANS SERVICING LP. The Servicer(s) services the loans on behalf of the Trust. Its rights and obligations are defined by a loan-servicing contract, usually located in the Pooling and Servicing Agreement in a private-label (non-GSE) deal. The trust may have more than one servicer servicing portions of the total pool, or there may be "Secondary Servicers," "Default Servicers," and/or "Sub-Servicers" that service loans in particular categories (e.g., loans in default). Any or all of the Primary, Secondary, or Sub-Servicers may be a division or affiliate of the Sponsor; however under the servicing contract the Servicer is solely responsible to the Trust and the Master Servicer (see next paragraph). The Servicers are the legal entities that do all the day-to-day "heavy lifting" for the Trustee such as sending monthly bills to borrowers, collecting payments, keeping records of payments, liquidating assets for the Trustee, and remitting net payments to the Trustee.

The Servicers are normally paid based on the type of loans in the Trust. For example, a typical annual servicing fee structure may be: .25% annually for a prime mortgage; .375% for an Alt-A or Option ARM; and .5% for a subprime loan. In this example, a subprime loan with an average balance over a given year of $120,000 would generate a servicing fee of $600.00 for that year. The Servicers are normally permitted to retain all "ancillary fees" such as late charges, check by phone fees, and the interest earned from investing all funds on hand in overnight US Treasury certificates (sometimes called "interest earned on the float").

8. **Master Servicer**. WELLS FARGO BANK, N.A. The Master Servicer is the Trustee's representative for assuring that the Servicer(s) abide by the terms of the servicing contracts. For trusts with more than one servicer, the Master Servicer has an important administrative role in consolidating the monthly reports and remittances of funds from the individual servicers into a single data package for the Trustee. If a Servicer fails to perform or goes out of business or suffers a major downgrade in its servicer rating, then the Master Servicer must step in, find a replacement and assure that no interruption of essential servicing functions occurs. Like all servicers, the Master Servicer may be a division or affiliate of the Sponsor but is solely responsible to the Trustee. The Master Servicer receives a fee, small compared to the Primary Servicer's fee, and based on the average balance of all loans in the Trust.

Copyright © 2010, 2011, 2012, 2013  Lawrence M. Asuncion. All Rights Reserved.

 

**9. Custodian(s).** LASALLE BANK N.A. and WELLS FARGO BANK, N.A. The Master Document Custodian (MDC) takes and maintains physical possession of the original hard-copy Mortgage Notes, Deeds of Trust, the assignments, sales and purchase agreements and certain other "key loan documents" that the parties deem essential for the enforcement of the mortgage loan in the event of default. The MDC must also execute representations and attestations that all of the transfers really and truly occurred "on time" and in the required "order" and that "true sales" occurred at each link in the chain.

- This is done for safekeeping and also to accomplish the transfer and do the negotiation for the possession of the Notes that is essential under the Uniform Commercial Code for a valid transfer to the Trustee to occur.
- Like the Master Servicer, the Master Document Custodian is responsible by contract solely to the Trustee (e.g., the Master Document Custodial Agreement). However, unlike the Master Servicer, the Master Document Custodian is an institution wholly independent from the Servicer and the Sponsor.
- There are exceptions to this rule in the world of Fannie Mae/Freddie Mac ("GSE") securitizations. The GSE's may allow selected large originators with great secure storage capabilities (in other words, large banks) to act as their own Master Document Custodians. But even in those cases, contracts make clear that the GSE Trustee, not the originator, is the nominal owner of the Note and the mortgage loan.
- The Master Document Custodian must review all original documents submitted into its custody for strict compliance with the specifications set forth in the Custodial Agreement, and deliver exception reports to the Trustee and/or Master Servicer as to any required documents that are missing or fail to comply with those specifications.
- In so doing the Custodian must in effect confirm that for each loan in the Trust there is a "complete and unbroken chain of transfers and assignments of the Notes and Mortgages."
- This does not necessarily require the Custodian to find assignments or endorsements naming the Depositor or the Trustee. The wording in the Master Document Custodial Agreement must be read closely. Defined terms such as "Last Endorsee" may technically allow the Custodian to approve files in which the last endorsement is from the Sponsor in blank, and no assignment to either the Depositor or the Trustee has been recorded in the local land records.
- In many private-label securitizations a single institution fulfills all of the functions related to document custody for the entire pool of loans. In these cases, the institution might be referred to simply as the "Custodian" and the governing document as the "Custodial Agreement."

Copyright © 2010, 2011, 2012, 2013.  Lawrence M. Asuncion. All Rights Reserved



## Real Estate Mortgage Investment Conduits ("REMICS")

The Tax Reform Act of 1986 established the legal basis of REMICs (100 Stat. 2085, 26 U.S.C.A. §§ 47, 1042), which eliminated double taxation of these securities. The principal advantage of forming a REMIC for the sale of mortgage-backed securities (MBS) is that the REMIC is treated as pass-through vehicles for tax purposes, avoiding double-taxation.  A REMIC can be structured as an entity (i.e., partnership, corporation, or trust) or simply as a segregated pool of assets, so long as the entity or pool meets certain requirements regarding the composition of assets and the nature of the investors' interests. No tax is imposed at the REMIC level. To qualify as a REMIC, all of the interests in the REMIC must consist of one or more classes of "regular interests" and a single class of "residual interests." Regular interests can be issued in the form of debt, stock, partnership interests, or trust certificates, or any other form of securities, but must provide the holder the unconditional right to receive a specified principal amount and interest payments. REMIC regular interests are treated as debt for federal tax purposes. A residual interest in a REMIC, which is any REMIC interest other than a regular interest, is, on the other hand, taxable as an equity interest.

In most mortgage-backed securitizations, the owner of a pool of mortgage loans (usually the Sponsor) sells and transfers such loans to a QSPE, usually a trust, that is designed specifically to qualify as a REMIC, and simultaneously, the QSPE issues securities that are backed by cash flows generated from the transferred assets to investors in order to pay for the loans along with a certain return. If the special purpose entity qualifies as a REMIC, then any income of the QSPE is "passed through" and, therefore, not taxable until the income reaches the holders of securities issued by the REMIC, also known as beneficiaries of the REMIC trust.

**Accordingly, it can be argued that the trustee, the QSPE, and the other parties servicing the trust, have no legal or equitable interest in the securitized mortgages. Therefore, it can be further asserted that any servicer who alleges that they are, or that they have the right or have been assigned the right to claim, that they are the holder of the note for purposes of standing to bring an action of foreclosure, is stating a legal nullity.** Any argument containing such an allegation by the servicer would be questionable on this basis. Of course, that is exactly what the servicer of a securitized mortgage purported to be in default claims. The same is the case when a lender makes that same claim.  The party shown as "Lender" on the mortgage note was instrumental in the sale and issuance of the certificate-to-certificate holders, which means the lender(s) knew that they were not any longer the holder of the note.

The QSPE is a weak repository and is not engaged in active management of the assets and so, a servicing agent is appointed. **Moreover, all legal and equitable interest in the mortgages is required by the REMIC to be passed through to the certificate holders.  Compliance with the legal limitations on REMICs and insulating the trust assets from creditors of third parties (who create or service the trust) leads to unilateral restructuring of the terms and conditions of the original note and mortgage.**

A typical mortgage pool consists of anywhere from 2,000 to 5,000 loans. This represents millions of dollars in cash flow payments each month from a servicer (receiving payments from borrowers) to a

Copyright © 2010, 2011, 2012, 2013.  Lawrence M. Asuncion. All Rights Reserved

 

REMIC (QSPE) with the cash flow "passing through", tax-free, to the beneficiaries of the trust (investors). Those proceeds are not taxed until received as income to the investors. Only the investors have to pay income taxes on the payments of mortgage interest received.

**TO EMPHASIZE AGAIN, in order for one of these investment trusts to qualify for the "pass through" tax benefit of a REMIC, ALL LEGAL AND EQUITABLE INTEREST IN THE MORTGAGES HELD IN THE NAME OF THE TRUST ARE VESTED IN THE INVESTORS, not in anyone else AT ANY TIME. If legal and/or equitable interest in the mortgages held in the name of the trust is claimed by anyone other than the investors, those that are making those misrepresentations are either defrauding the investors, or the homeowners & courts, or both.**

So, if the trust, or a servicer, or a trustee, acting on behalf of the trust, is found to have violated the very strict REMIC guidelines (put in place in order to qualify as a REMIC), the "pass through" tax status of the REMIC can be revoked.

According to **Section 860 of the Internal Revenue Code**, in order for an investment entity to qualify as a REMIC, all steps in the "contribution" and transfer process (of the notes) **must be true and complete sales between the parties and must be accomplished within the three month time limit from the date of "startup" of the entity.** Therefore, every transfer of the note(s) must be a true purchase and sale, and, consequently the note must be endorsed from one entity to another. Any mortgage note/asset identified for inclusion in an entity seeking REMIC status must be sold into the entity within the three-month time period calculated from the official startup day of the REMIC. Any procedural defect relating to endorsement, notarization, assignment of rights, and recordation renders foreclosure action on the loan asset on behalf of the REMIC vulnerable to stay of foreclosure, and possible dismissal through absence of proper standing to proceed.

## Standing in the Event of Mortgage Default

Before securitization, the holder of an enforceable note has a financial responsibility for any losses that may occur arising from a possible default, which means that holder also has the authority to take steps to avoid any such losses (the right to foreclose). Securitization, however, effectively severs such financial responsibility for losses.

With securitization the mortgage is converted into something different from what was originally represented to the mortgagor/homeowner. For one thing, since the party (or parties) taking action to foreclose does not actually hold any legal or equitable interest in any securitized mortgage, they have not realized any loss or damages resulting from the purported default. Therefore, it also follows that the foreclosing party avoids the liability, which could result if a class of certificate holders claimed wrongful injury resulting from a modification made to achieve an alternate dispute resolution.

Securitization also makes the mortgage and note unalienable. The reason is simple: once certificates have been issued, the note cannot be transferred, sold or conveyed; at least not in the sense that such a transfer, sale, or conveyance should be considered lawful, legal, and legitimate. This is

Copyright © 2010, 2011, 2012, 2013. Lawrence M. Asuncion. All Rights Reserved.



because the securitized note forever changes the nature of that instrument in an irreversible manner. It might appear that the inability to alienate the note has no adverse consequences for the debtor, but recent history disproves this notion. Several legislative and executive efforts to pursue alternative dispute resolution and to provide financial relief to distressed homeowners have been thwarted by the inability of the United States government to buy securitized mortgages without purchasing most of the certificates issued.

An SPV cannot sell any individual mortgage because the certificate holders do not hold mortgages individually; the certificate holders own the thousands of mortgages held in the name of the REMIC collectively. Likewise, the certificate holders cannot sell the mortgages. All the certificate holders have are the securities, each of which can be publicly traded. The certificate holders are, in no sense, holders of any specific individual note and have no legal interest in any specific individual note. The certificate holders do not each hold undivided fractional interests in a note, which added together, total 100%. The certificate holders also are not the assignees of one or more specific installment payments made pursuant to the note.

For the certificate holder, there is no note. A certificate holder does not look to a specific note for their investment's income payment. Instead, the certificate holder holds a security to a bond with specific defined payments. The issuer of trust certificates is selling segments of cash flow. The concept of securitization is brilliant. It began as a simple idea; a way to convert illiquid, long term debt into liquid, tradable short-term debt. It cashes out the lender, allowing the lender to make new "loans" while realizing an immediate profit on the notes sold.

## Maintaining a Valid Lien on a Securitized Mortgage

To visually frame the complete picture relating to the required legal processes associated with securitization, Chart 7 herein shows and follows the flow of the required proper assignments and actual possession of the mortgagor's original "wet ink" Promissory Note and Deed of Trust (Security Instrument assignment, equivalent to a Mortgage) for a party enforcing foreclosure action against the borrower. Such a borrower may succeed in delaying or stopping legal action by the foreclosing party by having the court examine the standing of the foreclosing party and that party's records and procedures.

The procedure for selling of the loans was to create a situation whereby certain REMIC tax laws were observed, and whereby the issuing Entity and the Lender would be protected from bankruptcy issues regarding either entity going into bankruptcy. For the MBS Trust to acquire this protection from Lender and Issuer bankruptcy, two "True Sales" of the loans had to occur, when loans were transferred to different entities. A "True Sale" of the loan would be a circumstance whereby one party owned the Note, and then sold it to another party. An offer would be made, and then accepted, with compensation given to the "seller" in return for the Note. The Notes would be transferred, and the security instruments (Mortgages or Deeds of Trust) "assigned to the buyers" of the Note, with an Assignment made every step of the way, and each Note endorsed to the next party.

At least in theory, that is how the process would work. Chart 7 below outlines the proper

Copyright © 2010, 2011, 2012, 2013.  Lawrence M. Asuncion. All Rights Reserved.

 

process to maintain a valid lien, one that would permit a servicer of an MBS Trust to foreclose on a borrower in purported default.

**Proper Securitization Process/Transaction Flow Chart (Maintaining a Valid Lien)**



Chart 7: Flow Chart Showing Proper Assignments to Maintain a Valid Lien in a Securitized Mortgage

Copyright © 2010, 2011, 2012, 2013. Lawrence M. Asuncion. All Rights Reserved.

 

## Forensic Audit - Mortgage Loan Securitization

CSA auditing reviewed the subject mortgage loan to determine if original lender **FAMILY LENDING SERVICES, INC.** sold it to the secondary market for securitization. It was noted that:

* FAMILY LENDING SERVICES, INC. (hereinafter "FAMILY LENDING"), the original lender in the Promissory Note ("Note") and Deed of Trust ("DOT"), originated the subject mortgage loan on April 7, 2006; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (hereinafter "MERS") was named lender's nominee, successors and assigns, and the beneficiary under the DOT. However, MERS was not referenced on the Note in any capacity.

### About FAMILY LENDING SERVICES, INC.

FAMILY LENDING SERVICES, INC., was the mortgage banking arm of STANDARD PACIFIC CORPORATION. FAMILY LENDING was licensed in California, Arizona, Colorado, Texas, North Carolina, South Carolina, and Florida, as a retail and wholesale lender providing mortgage loans for borrowers with credit history problems or difficult to verify income, bringing alternative financing solutions to many that would otherwise be unable to obtain home loans. Parent company STANDARD PACIFIC CORPORATION changed the name of FAMILY LENDING SERVICES, INC. to STANDARD PACIFIC MORTGAGE in May 2007.

The Company processed and funded conventional and alternative/non-conforming mortgages that were submitted through a national network of approved mortgage brokers and sold substantially all its residential mortgage loans in the secondary market through securitizations or whole loan pool sales. Whole loan pool sales involved the sale of an entire pool of mortgage loans to one purchaser.

FAMILY LENDING largely funded its mortgage originations using credit lines ("*warehouse lines*") provided by a consortium of financial firms (the "*warehouse lenders*"). These warehouse lines were short-term revolving credit facilities that FAMILY LENDING used to originate and fund new mortgages. During the frenzied period of mortgage loan securitization from 2002 to 2007, FAMILY LENDING substantially sold all its originated mortgages shortly after loan funding in securitization transactions (in this instant case to securitization "Sponsor" DJL MORTGAGE CAPITAL, INC.) and used the proceeds of the sale to pay down the balance on its warehouse lines. Generally, the warehouse lenders also acted as *underwriters* for FAMILY LENDING'S loan securitizations. This is what is known in the mortgage industry a "*table funding*" transaction wherein FAMILY LENDING acts as the "*table lender*" and the warehouse lenders are the "*table funders.*"

FAMILY LENDING'S securitizations (i.e., residential mortgage-backed securities referred to in the mortgage industry as "RMBS") were collateralized debt obligations ("CDOs") that represented claims to the periodic cash flows that are generated from pools of residential mortgage loans. When securitizing a pool of mortgages, FAMILY LENDING, first sold its originated mortgage loans to financial entities that serve as "sponsors" and "depositors" (i.e., intermediary sellers) to mortgage-backed securities trusts ("MBS trusts"). When selling its originated mortgage loans, FAMILY LENDING also sells the loan servicing rights in the securitized mortgage.

Copyright © 2010, 2011, 2012, 2013.  Lawrence M. Asuncion. All Rights Reserved.

 

In agency securitizations, the named "depositor" forms and registers each MBS trust with the SEC, electing to be treated as a *real estate mortgage investment conduit* ("REMIC") and qualify continuously as a tax-favored REMIC trust entity pursuant to the Tax Code of 1986. After purchasing whole loan pools from the securitization "sponsor/seller", on or before a specified a *"Closing Date"* pursuant to the terms and REMIC provisions of the governing securitization agreement called the *Pooling and Servicing Agreement* (also referred to as the *Trust* Agreement in the majority of securitization trust formations), the depositor immediately sells, without recourse, and transfers/conveys the Mortgage Loans to the MBS trust in exchange for securities certificates (the "Certificates). The appointed securitization "underwriter" then sells these certificates to the public for the depositor. These trust-issued Certificates (backed by the securitized Mortgage Loans in a pool) generally generate non-taxable "pass-through cash flows" at the trust level. The periodic cash flows are generated from the collective monthly mortgage payments of the mortgagors (borrowers), which are then distributed by the trustee of the MBS trust to its certificateholders (investors).

Because of the potential to quickly generate billions in profit, FAMILY LENDING joined other large lenders in the frenzy to securitize its mortgage loans shortly after funding. FAMILY LENDING offered ALT-A and subprime loans to borrowers with low credit ratings and significantly relaxed its loan underwriting requirements to qualify even non-qualified borrowers in most cases. Mortgage securitizations were an integral part of FAMILY LENDING'S business.

In this instant case, the first clue that led this examiner to eventually confirm that FAMILY LENDING in fact sold the subject mortgage loan to the secondary market for securitization was the fact that CREDIT SUISSE SECURITIES (USA) LLC is currently shown as the "Investor" on the website site of MERS, and WELLS FARGO BANK, N.A. d.b.a. AMERICA'S SERVICING COMPANY (hereinafter "ASC") took over as mortgage servicer from original lender FAMILY LENDING shortly after loan closing.

- It is well known that almost all the major lenders sold majority of their loans during the frenzied period of mortgage securitization from 2002 to 2007. Shortly after loan funding, wholesale lenders (like FAMILY LENDING) sell mortgages they originate through a securitization structure because of the immediate benefits it provides. Mortgage securitization allows the lender to instantly turn an illiquid asset such as a 30-year loan into liquid asset and immediately earn profits. The lender could then use the liquid funds to enter into new loan transactions and to earn more profits that are immediately realized… again and again (as well as the profits, fees and charges associated with the new transactions… and so on). In addition, the lender earns monthly fees for servicing the loan from the securitization trust.

- Specifically, FAMILY LENDING's *"5/25 One-Year LIBOR Adjustable Rate Interest-Only"* loan product (as in the subject mortgage loan) was one of the main types of mortgage loans that FAMILY LENDING sold and securitized on the secondary market. This particular loan product is considered predatory as the borrower is initially qualified for the loan using their *Interest-Only Payment* and not their fully amortized rate or payment. Thus, causing the borrower's debt-to-income ratio to skyrocket once the loan recasts as the borrower begins paying their fully

Copyright © 2010, 2011, 2012, 2013. Lawrence M. Asuncion. All Rights Reserved.

 

amortized payment. This loan recasting often results in a significantly higher monthly payment. When this happens most borrowers can no longer afford the mortgage they find themselves owing.

• As noted, MERS was named at the outset as FAMILY LENDING'S nominee under the DOT. MERS assigned a mortgage identification number ("MIN") on the subject mortgage loan. MERS' MIN 1000710-0010036083-5 is shown on the first page of the DOT.

*FACT: Normally, when MERS is named as nominee beneficiary at the onset in the mortgage (under the deed of trust only but not on the mortgage note), it is almost certain that the lender originating the mortgage loan intends to securitize such loan shortly after its origination/funding.*

### MERS' WEB SITE INFORMATION (on 1/11/2013):

MERS' MIN 1000710-0010036083-5 on the subject loan showed it is on <u>inactive status</u>. **WELLS FARGO BANK, NA d.b.a. AMERICA's SERVICING COMPANY** is shown as the current Loan Servicer and **CREDIT SUISEE SECURITIES (USA) LLC as INVESTOR.**



• As cited, the first clue that FAMILY LENDING sold the subject mortgage loan in the secondary market was the fact that MERS was designated as nominal beneficiary in the deed of trust and there is an investor, CREDIT SUISSE SECURITIES (USA) LLC, associated with the subject loan.

• Given that FAMILY LENDING sold to the secondary market substantially all its residential ARM loan products, CSA's research, investigation, and forensic audit focused on all of the SEC filings for mortgage-backed securities trusts ("MBS trusts") formed in the latter half of 2006 where one of the named "Underwriter" in the securitization transaction is CREDIT SUISSE SECURITIES (USA) LLC, and WELLS FARGO BANK, N.A. (d.b.a. AMERICA's SERVICING COMPANY) is one of the "Servicers."

• With the loan origination date of April 7, 2006 on one hand, and on the other, the specified "Cut-off Date" of July 1, 2006 and "Closing Date" on July 31, 2006 of one of mortgage-backed

Copyright © 2010, 2011, 2012, 2013. Lawrence M. Asuncion. All Rights Reserved.

 

securities trusts ("MBS") trusts reviewed where CREDIT SUISSE SECURITIES (USA) LLC was the "Underwriter" in the securitization transaction and WELLS FARGO BANK, N.A. as one of the "Servicers", **ADJUSTABLE RATE MORTGAGE TRUST 2006-3, ADJUSTABLE RATE MORTGAGE-BACKED PASS-THROUGH CERTIFICATE SERIES 2006-3** (hereinafter the **"ARM TRUST 2006-3"**) easily stands out as the MBS Trust where the subject loan was securitized. The first "Distribution Date" (of income) to certificateholders (investors) of this MBS Trust was on August 25, 2006, making it timely for the loan's third monthly mortgage payment due date. With an election and continuing qualification as a *Real Estate Mortgage Investment Conduit* ("REMIC"), the MBS Trust: ARM TRUST 2006-3 was formed with the execution of the *Pooling and Servicing Agreement* ("PSA") dated as of July 1, 2006. The PSA is the operative legal and binding contract governing the terms, operation, administration of the securitization transaction, as well as the ownership of the securitized mortgage loans.

- Below is the filing index listing of the 15 securitization *Documents and Exhibits* submitted by the Securitization Registrant and Depositor **CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.** (hereinafter **"CREDIT SUISSE FIRST BOSTON"**) from 7/18/2006 to 5/27/2008 (SEC File # 333-37616-05) for the MBS Trust: **ADJUSTABLE RATE MORTGAGE TRUST 2006-3**. Among others, these SEC filings included: (1) the *Prospectus Supplement dated 7/28/2006 [To Prospectus dated 6/28/2006]* filed on 8/1/2006 pursuant to SEC Rule 424(b)(5); (2) the *Pooling and Servicing Agreement ("PSA")* dated 7/1/2006 filed on 8/15/2006 as Form 8-K for 7/31/2006 EX-10.1; and (3) the *Mortgage Loan Tape* filed on 8/15/2006 as Form 8-K for 7/31/2006 EX. 10.7

 

## Securitization Participants Identified

| Original Lender | Original Loan Servicer: | Original Trustee: |
|---|---|---|
| FAMILY LENDING SERVICES, INC.<br>*(Table Lender)* | SELECT PORTFOLIO SERVICING | S.P.S. AFFILIATES |
| **Nominee for Lender/Beneficiary**<br>(In the Deed of Trust only): | **Loan Originator(s)** | **Loan Servicer (MBS Trust)** |
| MORTGAGE ELECTRONIC REGISTRY SYSTEMS, INC. ("MERS") | CREDIT SUISSE FINANCIAL CORP.<br>*(Table Funder)*<br>DLJ MORTGAGE CAPITAL, INC; and COUNTRYWIDE HOME LOANS | WELLS FARGO BANK, N.A.<br>d.b.a.<br>AMERICA'S SERVICING COMPANY<br>*(Current Servicer)* |
| **Sponsor and Seller** | **Depositor** | **Issuing Entity**<br>(The "MBS Trust") |
| DLJ MORTGAGE CAPITAL, INC. | CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP. | ADJUSTABLE RATE MORTGAGE TRUST 2006-3<br>ADJUSTABLE RATE MORTGAGE-BACKED PASS-THROUGH CERTIFICATES, SERIES 2006-3 |
| **Trustee** | **Custodians** | **Master Servicer & Trust Administrator** |
| U.S. BANK NATIONAL ASSOCIATION | LASALLE BANK N.A. & WELLS FARGO BANK N.A. | WELLS FARGO BANK, N.A. |

**ISSUER TRUST NAME:** ADJUSTABLE RATE MORTGAGE TRUST 2006-3
**TITLE OF SERIES:**      ADJUSTABLE RATE MORTGAGE-BACKED PASS-THROUGH CERTIFICATES, SERIES 2006-3
**Subject Loan Date:**      April 7, 2006
**Cut-Off Date:**      July 1, 2006
**Closing Date:**      July 31, 2006
**Distribution Date:**      25th of each month, beginning in August 2006
**Total Mortgage Loans:**      4,278 (Approximate as of Cut-Off Date)

Copyright © 2010, 2011, 2012, 2013. Lawrence M. Asuncion. All Rights Reserved.



Aggregate Principal Balance:  $1,465,104,372.00 (Approximate as of Cut-Off Date)

### Simplified Flow Chart of a Proper Process of Securitization



Chart 8 - Simplified Flow Chart, Proper Securitization Process

**The Prospectus Supplement [To Prospectus]**

By cross-referencing of the terms and characteristics of the subject mortgage loan (*See Section I, Page 3 of this report – "Original Loan Transaction Summary*) it led to a match within the range and parameters of the securitized mortgage loans, as described in *ANNEX III – MORTGAGE LOAN STATISTICAL INFORMATION  "Group 4 Mortgage Loans" of the Prospectus Supplement* dated 7/28/2006 *[to Prospectus dated 6/28/2006]* filed on 8/1/2006 pursuant to SEC Rule 424(b)(5).

*The offering Prospectus Supplement [To Prospectus] is included in entirety and part of this audit and analysis report as* **Exhibit "1."** *See ANNEX III of the Prospectus Supplement, specifically the highlighted tables of "Group 4 Mortgage Loans" from page 183 to 191 of 340 pages.*

**The Pooling and Servicing Agreement**

* The *Pooling and Servicing Agreement* ("PSA") dated as July 1, 2006 was among CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP. ("CREDIT SUISSE FIRST BOSTON"), as *"Depositor"*; DLJ MORTGAGE CAPITAL, INC. ("DLJMC"), as *"Seller"*; WELLS FARGO BANK, N.A. ("WELLS FARGO"), as *"Master Servicer, Servicer, and Trust Administrator"*; GREENPOINT MORTGAGE FUNDING, INC. ("GPMF"), as *"Servicer"*; SELECT PORTFOLIO SERVICING ("SPS"), as *"Servicer and Special Servicer"*; *and* U.S. BANK, NATIONAL ASSOCIATION ("U.S. BANK") in its capacity as *"Trustee"*.

Copyright © 2010, 2011, 2012, 2013.  Lawrence M. Asuncion. All Rights Reserved.